322 F.3d 1369
 HUAIYIN FOREIGN TRADE CORP. (30), Worldwide Link, Inc., Captain Charlie Seafood Wholesale Co., USA, Boston Seafood Processors, Inc., GMRI, Inc., and Ocean Duke Corp., Plaintiffs-Appellants,
v.
UNITED STATES, Defendant-Appellee, and
Crawfish Processors Alliance, Louisiana Department of Agriculture & Forestry, and Bob Odom, Commissioner, Defendants.
 No. 02-1484.
 United States Court of Appeals, Federal Circuit.
 March 21, 2003.
 
 COPYRIGHT MATERIAL OMITTED William E. Perry, Garvey, Schubert & Barer, of Washington, DC, for plaintiffs-appellants. With him on the brief was John C. Kalitka.
 A. David Lafer, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, for defendant-appellee. On the brief were Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director; and Mark L. Josephs, Senior Trial Attorney. Of counsel on the brief was Arthur D. Sidney, Attorney Advisor, Office of the Chief Counsel for Import Administration, Department of Commerce, of Washington, DC.
 Before MAYER, Chief Judge, LOURIE and CLEVENGER, Circuit Judges.
 CLEVENGER, Circuit Judge.
 
 
 1
 In a review of an antidumping order, the U.S. Department of Commerce ("Department") determined that a foreign producer of freshwater crawfish tail meat was subject to a dumping margin applicable to all similar producers from the People's Republic of China ("PRC"). The affected producer, Huaiyin Foreign Trade Corporation No. 30 and its domestic importers (collectively "Huaiyin-30") challenged the Department's determination in the Court of International Trade, which upheld the agency's decision. Huaiyin Foreign Trade Corp. (30) v. United States Dep't of Commerce, 201 F.Supp.2d 1351 (Ct. Int'l Trade 2002). Because the trial court did not err in its affirmance of the Department, we affirm.
 
 
 2
 * A
 
 
 3
 In September of 1996, domestic crawfish processors filed an antidumping duty petition with the Department, alleging that freshwater crawfish tail meat from the PRC was sold in the United States at less than fair value. Freshwater Crawfish Tail Meat From the People's Republic of China; Initiation of Antidumping Investigation, 61 Fed.Reg. 54,154 (Oct. 17, 1996). Acting on that petition, the Department initiated an investigation and sent questionnaires to various PRC freshwater crawfish tail meat exporters and producers. Notice of Preliminary Determination of Sales at Less Than Fair Value: Freshwater Crawfish Tail Meat From the People's Republic of China, 62 Fed.Reg. 14,392, 14,392-93 (Mar. 26, 1997). As it has done in previous investigations, the Department adopted in this proceeding a presumption that the PRC was a nonmarket economy ("NME") country pursuant to 19 U.S.C. § 1677(18)(A), requiring companies desiring an individualized antidumping duty margin to so request and to demonstrate an absence of state control. Id. at 14,394; see also Sigma Corp. v. United States, 117 F.3d 1401, 1405-07 (Fed.Cir. 1997) (reviewing and affirming the Department's use of the "NME presumption").
 
 
 4
 The Department received questionnaire responses from numerous companies, including Huaiyin Foreign Trade Corporation No. 5 ("Huaiyin-5"). As part of its response, Huaiyin 5 indicated that it was applying for a separate company-specific margin. See 62 Fed.Reg. at 14,393-94. Plaintiff Huaiyin-30, an entity unrelated to Huaiyin-5, took no part in the proceedings.
 
 
 5
 In August of 1997, the Department completed its investigation and sustained the domestic producers' allegations. As a result, it assigned a dumping duty margin of 201.63 percent ad valorem for all crawfish tail meat imported from the PRC as a whole and by exporters that failed to demonstrate independence from governmental control. Notice of Final Determination of Sales at Less Than Fair Value: Freshwater Crawfish Tail Meat From the People's Republic of China, 62 Fed.Reg. 41,347, 41,358 (Aug. 1, 1997), amended by Notice of Amendment to Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Freshwater Crawfish Tail Meat From the People's Republic of China, 62 Fed.Reg. 48,218, 48,219 (Sept. 15, 1997) (collectively "Final Determinations"). Although the PRC-wide rate applied by default, a small group of companies trading in crawfish tail meat requested and met the requirements for an individualized duty margin. Id. at 41,348. Huaiyin-5 was among the companies able to show an absence of state control and thus received a company-specific 91.5 percent ad valorem duty margin. Id. at 41,358. The antidumping duty margin serves as a cash deposit rate for the importer's estimated antidumping duties.
 
 
 6
 Like all crawfish tail meat exporters that did not take part in the proceedings, Huaiyin-30 should have paid the higher PRC-wide antidumping margin of 201.63 percent. However, the Department's notice of final rate determination was insufficiently precise and assigned the lower duty margin to a "Huaiyin Foreign Trade Corporation." Id. Although the Department intended to assign the 91.5 percent duty margin to Huaiyin-5, the notice's lack of precision enabled the homonymous Huaiyin-30 to take advantage of this lower duty margin.
 
 B
 
 7
 In 1998, domestic crawfish processors requested an administrative review of the antidumping order. In accordance with its regulations, the Department initiated the requested review by publishing a notice in the Federal Register. Initiation of Antidumping and Countervailing Duty Administrative Review, Requests for Revocation in Part and Deferral of Administrative Reviews, 63 Fed.Reg. 58,009 (Oct. 29, 1998) ("Notice of Initiation"). Specifically, the Notice of Initiation stated in relevant part:
 
 
 8
 In accordance with section 19 CFR 351.221(c)(1)(i), we are initiating administrative reviews of the following antidumping and countervailing duty orders and findings.
 
 
 9
 . . . .
 
 
 10
 Antidumping Duty Proceedings Period to be reviewed
 
 
 11
 . . . .
 
 
 12
 The People's Republic of China: 3/26/97-8/31/98
 
 Freshwater Crawfish Tail Meat,* A-570-848
 China Everbright Trading Company
 
 13
 Binzhou Prefecture Foodstuffs Import & Export Corp.
 
 
 14
 Huaiyin Foreign Trade Corp.
 
 
 15
 Yancheng Foreign Trade Corp.
 
 
 16
 Jiangsu Cereals, Oils & Foodstuffs Import & Export Corp.
 
 
 17
 Yancheng Baolong Aquatic Foods Co., Ltd.
 
 
 18
 Huaiyin Ningtai Fisheries Co., Ltd.
 
 
 19
 Nantong Delu Aquatic Food Co., Ltd.
 
 
 20
 Ninbo Nanlian Frozen Foods Company, Ltd.
 
 
 21
 *If one of the above named companies does not qualify for a separate rate, all other exporters of freshwater crawfish tail meat from the People's Republic of China who have not qualified for a separate rate are deemed to be covered by this review as part of the PRC entity of which the named exporter is a part.
 
 
 22
 Id. at 58,009-10.
 
 
 23
 As part of the administrative review, the Department sent questionnaires to the PRC crawfish tail meat exporters specifically identified in the Notice of Initiation, including Huaiyin-5. Based on Huaiyin-5's response, the Department ascertained that there was more than one company named "Huaiyin Foreign Trade Corporation," and that only Huaiyin-5 was actually entitled to the lower duty margin.
 
 
 24
 In September of 1999, the Department responded to an inquiry from the United States Customs Service ("Customs") by issuing a "Clarification of Message" to Customs, stating that only Huaiyin-5 was actually entitled to the 91.5 percent duty margin. As a result, Customs assigned the PRC-wide 201.63 percent duty margin to all of Huaiyin-30's crawfish tail meat entries and required domestic importers of Huaiyin-30's products to post additional cash deposits to cover the increase in duty margin.
 
 
 25
 On October 12, 1999, the Department published the preliminary results of its administrative review, finding that sales of PRC crawfish tail meat occurred at below fair value during the review period. Notice of Preliminary Results of Antidumping Duty Administrative Review and New Shipper Reviews, Partial Rescission of the Antidumping Duty Administrative Review, and Rescission of the New Shipper Review for Yancheng Baolong Biochemical Products, Co. Ltd.: Freshwater Crawfish Tail Meat From the People's Republic of China, 64 Fed.Reg. 55,236, 55,237 (Oct. 12, 1999) ("Preliminary Results"). The Department's Preliminary Results reaffirmed that, given the presumption that the PRC is a nonmarket economy, all exporters that did not request or were not able to show an absence of state control would receive the PRC-wide duty margin of 201.63 percent. Id. at 55,239.
 
 
 26
 After receiving comments to the Preliminary Results from various interested parties, including Huaiyin-30, the Department published the final results of its administrative review. Freshwater Crawfish Tail Meat From the People's Republic of China: Final Results of Administrative Antidumping Duty and New Shipper Reviews, and Final Rescission of New Shipper Review, 65 Fed.Reg. 20,948 (Apr. 19, 2000) ("Final Results"). In the Final Results, the Department determined that Huaiyin-30 was subject to the PRC-wide duty margin of 201.63 percent, because it did not timely request a separate, company-specific duty rate. Id. at 20,949. Moreover, the agency clarified that Huaiyin-5 and the "Huaiyin Foreign Trade Corporation" mentioned in earlier notices and decisions constituted the same entity, and that this entity became subject to the higher duty margin of 201.63 percent because it failed to adequately prove an absence of state control during this administrative review. Id.
 
 
 27
 Huaiyin-30 filed suit in the Court of International Trade to challenge the Department's determinations published in the Final Results, but the trial court affirmed the Department's antidumping duty decision. First, the court found that the Department provided adequate notice to Huaiyin-30 regarding the administrative review at issue. Huaiyin Foreign Trade, 201 F.Supp.2d at 1357-61. Second, it ruled that the Department properly clarified to Customs that only Huaiyin-5, and not Huaiyin-30, was entitled to make cash deposits at the lower antidumping duty margin of 91.5 percent. Id. at 1361-62. Finally, the trial court held that the payment of antidumping duties to the domestic industry in accordance with the Byrd Amendment did not transform the antidumping duty regime into one that imposes a penalty. Id. at 1362-66. Huaiyin-30 timely appealed the Court of International Trade's decision, vesting us with jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).
 
 II
 
 28
 "When reviewing anti-dumping determinations made by Commerce, this court applies anew the standard of review applied by the Court of International Trade in its review of the administrative record." F.LLI De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1031 (Fed.Cir.2000); see also Cemex, S.A. v. United States, 133 F.3d 897, 900 (Fed.Cir.1998).
 
 
 29
 As required by statute, we will sustain the agency's antidumping determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (2000). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). We determine the existence of substantial evidence by considering the record as a whole, including evidence that supports as well as evidence that "fairly detracts from the substantiality of the evidence." Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed.Cir.1984).
 
 
 30
 In reviewing the Department's construction of a statute it administers, we defer to the agency's reasonable interpretation of the antidumping statutes if not contrary to an unambiguous legislative intent as expressed in the words of the statute. See Timex V.I., Inc. v. United States, 157 F.3d 879, 881-82 (Fed.Cir. 1998). Similarly, we accord substantial deference to the agency's interpretations of its own regulations. Torrington Co. v. United States, 156 F.3d 1361, 1363-64 (Fed.Cir.1998).
 
 III
 
 31
 Huaiyin-30 advances four contentions in this appeal. It contends that the Department failed to comply with the procedures governing the administrative review proceeding and to provide the plaintiff with a meaningful opportunity to participate in the review. It further argues that the agency improperly applied the higher PRC-wide duty margin retroactively by issuing the "Clarification of Message" to Customs. Huaiyin 30 further asserts that a recent statutory change that directs payment of antidumping duties to the domestic industry fundamentally alters the antidumping law into a statute imposing a penalty. We address each contention seriatim.
 
 
 32
 * Huaiyin-30's first ground for reversal focuses on the procedure used to request and initiate the administrative review. Relying on 19 U.S.C. § 1675(a) and 19 C.F.R. § 353.213 (2000), it asserts that it is not subject to the results of the review, because it was not named either in the domestic producers' request for administrative review or in the Department's Notice of Initiation. Controlling precedent disposes of this argument.
 
 
 33
 We recently considered the same contention in Transcom, Inc. v. United States, 294 F.3d 1371, 1377-78 (Fed.Cir.2002) ("Transcom IV"). In that case, the Department determined that two Hong Kong resellers of tapered roller bearings from the PRC were subject to a dumping margin, causing Transcom, one of the resellers' bearings importers, to challenge the Department's determination. Id. at 1376-77. Among the arguments it raised on appeal, Transcom contended that a company must be specifically named in the request for review and in the notice of initiation before that company may become subject to the results of the administrative review. Id. at 1377.
 
 
 34
 We rejected that argument, because neither the controlling statute nor the applicable regulation supported Transcom's contention. As we explained:
 
 
 35
 The governing statute, 19 U.S.C. § 1675(a) (1988), does not limit Commerce's administrative review to those companies specifically named in the interested party's request for review. Furthermore, although the applicable regulation requires specificity in a request for review, see 19 C.F.R. § 353.22(a) (1994), it places no such limitation on Commerce. To the contrary, the regulation authorizes Commerce to define the scope of the review independent of the request. Id. § 353.22(c). Accordingly, we see no statutory or regulatory basis for ruling that when Commerce conducts an administrative review in response to a request from an interested party, the scope of the review is limited to the scope of the interested party's request.
 
 
 36
 Id. We then underscored that conclusion by considering the agency's own interpretation of its regulation, and the regulatory history of that rule. From that inquiry, we determined that "[n]othing in the legislative history of the amendment indicates that it was intended to limit Commerce's ability to frame administrative reviews more broadly than the triggering requests for review." Id. at 1378. Accordingly, we held that neither the statute nor the regulation precluded the Department's inclusion of an entity that was unnamed in the request for review or the notice of initiation of the review. Id.
 
 
 37
 Given that Huaiyin-30's instant challenge relies on the same statute and regulatory provision that we interpreted in Transcom IV, see Antidumping Duties; Countervailing Duties, 61 Fed.Reg. 7308, 7317 (proposed Feb. 27, 1996) (indicating a recodification of the Department's existing regulations and stating that new "[s]ection 351.213 is based largely on existing §§ 353.22 and 355.22"), that case's interpretation of the applicable statute and regulation necessarily controls here as a matter of stare decisis. See Bankers Trust N.Y. Corp. v. United States, 225 F.3d 1368, 1376 (Fed.Cir.2000) (holding that this court is bound by its own earlier decisions directly construing a statutory provision). Thus, Huaiyin-30's argument is unavailing. It cannot avoid the Department's duty margin simply because it was not specifically named in the request for review or in the Notice of Initiation.
 
 B
 
 38
 Alternatively, Huaiyin-30 claims that the language in the Notice of Initiation that purports to conditionally cover its import in the administrative review failed to provide adequate notice and thus deprived it of the opportunity for meaningful participation. We disagree.
 
 
 39
 In the context of the Department's administrative review of dumping margins, we have construed the relevant statutory and regulatory provisions as requiring that "any reasonably informed party should be able to determine, from the published notice of initiation read in light of announced Commerce Department policy, whether particular entries in which it has an interest may be affected by the administrative review." Transcom, Inc. v. United States, 182 F.3d 876, 882-83 (Fed.Cir.1999) ("Transcom I"). Thus, the adequacy of administrative review notice depends on the particular language used in the review's notice of initiation, as well as the Department's prevailing review policy at that time. See Transcom IV, 294 F.3d at 1378-79.
 
 
 40
 In Transcom I, we ruled that the Department's antidumping duties were not assessed in accordance with law, because the agency did not specifically name Transcom's exporters among the entities listed in the published notices of initiation for those reviews. Transcom I, 182 F.3d at 881 ("Transcom had no reason to expect that the antidumping duties on its exporters' products could be affected by proceedings in which the exporters were not named as parties."). However, we reaffirmed that the Department did not need to provide personal notice of the proceedings, id. at 882 (citing Goldhofer Fahrzeugwerk GmbH & Co. v. United States, 885 F.2d 858, 860 (Fed.Cir.1989)), and indicated that the agency was free to select a variety of means to give reasonable notice that the goods of unnamed exporters would be subject to the administrative review. Id. at 882-83. As an example of the various forms of notice available to the agency, we mentioned, without passing on the propriety of that approach, that the Department had started to provide in its published notices of initiation that all unnamed exporters would be "conditionally covered" by the review. Id. at 882.
 
 
 41
 A subsequent appeal involving the same importer required us to determine whether this "conditional coverage" form of notice satisfied statutory and regulatory requirements. Transcom IV, 294 F.3d at 1378-79. Adopted by the agency since 1996, the notice of initiation in that appeal only stated that "[a]ll other exporters of tapered roller bearings are conditionally covered by this review." Id. at 1375 (alteration in original). As later described by the Department, this "conditional coverage" meant that, if one of the companies named in the published notice of initiation did not qualify for a separate rate, all other exporters that have not qualified for a separate rate would be deemed covered by the review. See id. at 1378 (citing 61 Fed.Reg. 65,527, 65,545 (Dec. 13, 1996)). Despite the terse wording of the "conditional notice," we ruled that it was consistent with statutory and regulatory provisions. Id. at 1378-79.
 
 
 42
 In this respect, this case differs significantly from our previous Transcom decision, 182 F.3d 876 [Transcom I]. The notice of initiation in that case was limited to identifying specific exporters; it contained no indication that other, unnamed exporters were subject to the review. As a result, the clear implication of the notice was that parties that were not named in the notice were excluded from the review.... In this case, by contrast, the notice of initiation advised any entity exporting tapered roller bearings manufactured in China that it was within the scope of the administrative review and would be subject to antidumping duties depending on the outcome of the review process.
 
 
 43
 Id. at 1379. Given the adequate notice and the available opportunities to participate in the review, we dismissed Transcom's claim of unfair surprise at the inclusion of its entries in the administrative review. Id. at 1379-80.
 
 
 44
 In the present appeal, despite Huaiyin-30's claim to the contrary, the language used in the Notice of Initiation does not suffer from the same infirmities as the notice in Transcom I. In addition to listing the nine entities specifically encompassed by the administrative review, the Department further included a "conditional coverage" provision that states:
 
 
 45
 If one of the above named companies does not qualify for a separate rate, all other exporters of freshwater crawfish tail meat from the People's Republic of China who have not qualified for a separate rate are deemed to be covered by this review as part of the PRC entity of which the named exporter is a part.
 
 
 46
 Notice of Initiation, 63 Fed.Reg. at 58,010. That language indicates that the administrative review would not be limited to the nine entities specifically named in the Notice of Initiation, but would have a broader scope. Hence, that "conditional coverage" provision sufficed to differentiate this notice from the inadequate announcement in Transcom I. See Transcom IV, 294 F.3d at 1379.
 
 
 47
 The instant provision is more akin to the "conditional coverage" statement we deemed statutorily and regulatorily sufficient in Transcom IV. In that case, we ruled that the cryptic phrase "all other exporters of tapered roller bearings are conditionally covered by this review" contained in the notice of initiation sufficed to place the importer on notice. The instant "conditional coverage" provision in the Notice of Initiation exceeds in detail and clarity the similar statement approved by our precedent. Upon examining that detailed provision, seasoned importers, like Huaiyin-30, would have noted the broader scope of the administrative review and realized that the review could possibly affect their crawfish tail meat entries. If Huaiyin-30 had any doubt about the meaning and scope of the provision, a phone call or letter to the Department would have clarified any possible ambiguity. Yet, it refused to act and we decline to reward that unilateral mistake.
 
 
 48
 On this record and in light of precedent, we conclude that the "conditional coverage" provision in the Notice of Initiation satisfied controlling statutory and regulatory requirements, and sufficed to place a "reasonable informed party" in Huaiyin-30's position on notice that its crawfish tail meat entries could be subject to the administrative review. See Transcom IV, 294 F.3d at 1379.
 
 C
 
 49
 For a few years, Huaiyin-30 benefited from the lower dumping margins assigned to the homonymous Huaiyin-5, because the Department's rate determination only indicated a company-specific duty margin for "Huaiyin Foreign Trade Corporation," without differentiating between the numerous entities bearing that name. When that fact came to light during the administrative review, the Department issued a "Clarification of Message" to Customs, causing Customs to require all of Huaiyin-30's crawfish importers to post additional cash deposits. Believing that it is entitled to the lower dumping duty margin, Huaiyin-30 contends that the Department's "Clarification of Message" constituted a change to the Final Determinations order, resulting in an improper retroactive increase to its importers' cash deposit rate. That contention does not withstand scrutiny.
 
 
 50
 First, Huaiyin-30 had no entitlement to the lower duty margin. In making its Final Determinations, the Department applied an NME presumption to the PRC, pursuant to which it presumed that the PRC government controlled the export activities of the companies that failed to respond to its questionnaires. Final Determinations, 62 Fed.Reg. at 41,349. Only entities able to demonstrate their independence from the PRC government were entitled to an individual rate as if they were part of a market economy. Id.; see also Sigma Corp., 117 F.3d at 1405-06 (discussing and approving use of NME presumption). Based on the responses and evidence it received from participating companies during its investigation, the Department calculated company-specific rates for only eight entities. Final Determinations, 62 Fed.Reg. at 41,358. Beyond those eight specifically-named entities, the Department instructed Customs to apply the PRC-wide higher dumping duty margin of 201.63 percent to all exporters not specifically identified in the Final Determinations. Id. Since Huaiyin 30 concedes that it neither participated in the initial investigation nor provided any evidence that it was independent from the PRC, it necessarily fell within the ambit of the NME presumption and the Department justifiably determined that the PRC controlled its export activities. Subject to the presumption, Huaiyin-30 received the default PRC-wide dumping duty margin; it could not and did not receive a lower rate. Consequently, by its own admission, Huaiyin-30 was not entitled to any rate other than the higher PRC-wide duty margin.
 
 
 51
 Second, there was no change in the Final Determinations order, as Huaiyin-30 alleges. It is well-established that the "Commerce Department enjoys substantial freedom to interpret and clarify its antidumping orders." Novosteel SA v. United States, 284 F.3d 1261, 1269 (Fed. Cir.2002) (quoting Ericsson GE Mobile Communications, Inc. v. United States, 60 F.3d 778, 782 (Fed.Cir.1995)). But the Department "cannot `interpret' an antidumping order so as to change the scope of that order, nor can Commerce interpret an order in a manner contrary to its terms." Eckstrom Indus., Inc. v. United States, 254 F.3d 1068, 1072 (Fed.Cir.2001) (citation omitted); see also Ericsson GE, 60 F.3d at 782 (determining that the Department improperly expanded an antidumping order during a scope determination). In this case, contrary to Huaiyin-30's assertions, the scope of the order remained unchanged. The only entity bearing the name "Huaiyin Foreign Trade Corporation" that participated in the Department's investigation and provided evidence of PRC independence was Huaiyin-5. But, the Department had no reason to specify and add the numerical designation until the administrative review, when Huaiyin-5 indicated that there were many entities named "Huaiyin Foreign Trade Corporation" and that it seldom used the number five in its paperwork to date. Once the Department ascertained these issues, the agency acted within the scope of its authority to clarify which company could benefit from the lower duty margin. The Department's "Clarification of Message" neither changed the companies entitled to the decreased rate, nor modified the type of products covered by the Final Determinations order. A clarification occurred, not a change in scope.
 
 
 52
 Finally, neither the Department nor Customs failed to act in accordance with law in seeking to collect Huaiyin-30's illgotten benefits. The Department correctly fulfilled its duty by clarifying which entity was actually entitled to the lower duty margin. Similarly, Customs carried out its assigned functions in directing the posting of additional cash deposits when it received the Department's clarification. As Huaiyin-30 concedes, the name confusion worked to its advantage, enabling it to import products at a much lower duty margin than the correct rate. If we permitted Huaiyin-30 to keep its ill-gotten gains, we would frustrate the antidumping statutes' aim of protecting domestic industries from sales at less than fair value. In fact, were we to restrict Customs to prospective collections of deposit rates in this case, we would discourage companies from participating in the Department's investigations and would reward entities like Huaiyin-30 for their violations of applicable laws and regulations. Therefore, we decline to rule that either the Department or Customs acted "not in accordance with law."
 
 
 53
 In sum, Huaiyin-30 was not entitled to the lower duty margin, nor can it claim that the government has acted improperly in this case. We therefore reject the claim of error related to the "Clarification of Message."
 
 D
 
 54
 Finally, the Court of International Trade correctly ruled that the Continued Dumping and Subsidy Offset Act of 2000 ("Byrd Amendment"), Pub.L. No. 106-387, § 1(a), 114 Stat. 1549 (2000) (codified at 19 U.S.C. § 1675c(a) (2000)), did not convert the antidumping statute into a penal one, and thus did not confer on Huaiyin-30 the constitutional protections of the Fifth Amendment.
 
 
 55
 Through the imposition of duties, the Antidumping Act of 1921 aims to equalize competitive conditions between foreign exporters and domestic industries affected by dumping. See Chaparral Steel Co. v. United States, 901 F.2d 1097, 1103-04 (Fed.Cir.1990); see also C.J. Tower & Sons v. United States, 21 C.C.P.A. 417, 71 F.2d 438, 445-46 (CCPA 1934). Until recently, the duties collected pursuant to the antidumping statute were deposited with the Treasury for general purposes. In 2000, Congress modified that statute by enacting the Byrd Amendment, which provides that:
 
 
 56
 Duties assessed pursuant to a countervailing duty order, an antidumping duty order, or a finding under the Antidumping Act of 1921 shall be distributed on an annual basis under this section to the affected domestic producers for qualifying expenditures. Such distribution shall be known as the "continued dumping and subsidy offset." 19 U.S.C. § 1675c(a) (2000). The Byrd Amendment thus instructs Customs to distribute collected antidumping duties to the domestic firms that petition for relief and to those that supported the petition. See id. § 1675c(b)(1). And, because the Amendment applies retroactively to assessments made on or after October 1, 2000, it controls this case and Customs must consequently distribute the duties collected from Huaiyin 30 and its domestic importers to affected domestic producers. See 19 C.F.R. § 159.61(a) (2002).
 
 
 57
 Pointing to the change effected by the Byrd Amendment, Huaiyin-30 contends that the requirements for procedural due process now attach to the agency's decisions and necessitate a hearing by a neutral judge before dumping duties may be imposed. At the heart of Huaiyin-30's argument is the contention that payment of duties to affected domestic producers makes the antidumping statute punitive. That contention, however, cannot prevail. A statute imposes a penalty only when:
 
 
 58
 (1) the costs imposed are unrelated to the amount of actual harm suffered and are related more to the penalized party's conduct, (2) the proceeds from infractions are collected by the state, rather than paid to the individual harmed, and (3) the statute is meant to address a harm to the public, as opposed to remedying a harm to an individual.
 
 
 59
 Ingalls Shipbuilding, Inc. v. Dalton, 119 F.3d 972, 978 (Fed.Cir.1997) (ruling that 33 U.S.C. § 944(c)(3) was not a penal statute) (citing and discussing Huntington v. Attrill, 146 U.S. 657, 13 S.Ct. 224, 36 L.Ed. 1123 (1892)). Applying that test to these facts, it is clear that none of the Ingalls factors supports Huaiyin-30's contention.
 
 
 60
 First, the duties imposed on foreign companies or domestic importers of dumped products remain proportional to the amount of harm caused by the anticompetitive conduct. After the passage of the Byrd Amendment, importers' liability for antidumping duties continues to be "equal to the amount by which the normal value of the merchandise exceeds the export price (or the constructed export price) of the merchandise." 19 U.S.C. § 1673e(a) (2000). In other words, the antidumping duties assessed under the current collection regime are identical to those assessed prior to implementation of the Byrd Amendment, remaining proportional to the harm caused by dumping. The duties are thus not related to the magnitude or egregiousness of the misconduct.
 
 
 61
 Second, the Byrd Amendment now directs Customs to pay the collected antidumping duties to individuals harmed by the anticompetitive conduct. Instead of depositing the assessed duties with the Treasury as it did prior to the Amendment, the agency now annually distributes those amounts to the domestic firms that petitioned for relief and to those that supported the petition. See id. § 1675c(b). Far from rendering the antidumping statute penal in nature as Huaiyin-30 argues, the Byrd Amendment actually enhances its remedial nature. The duties now bear less resemblance to a fine payable to the government, and look more like compensation to victims of anticompetitive behaviors.
 
 
 62
 Third, the congressional findings supporting the Amendment underscore the statute's continued focus on assisting domestic producers and leveling competitive conditions through the negation of the unfair advantage gained by the price difference of the imported products. See Pub.L. No. 106-387, 114 Stat. at 1549A-72, republished at 19 U.S.C.A. § 1675c note (West Supp.2002) (stating that "injurious dumping is to be condemned and actionable subsidies which cause injury to domestic industries must be effectively neutralized[;]" because "[w]here dumping or subsidization continues, domestic producers will be reluctant to reinvest or rehire and may be unable to maintain pension and health care benefits that conditions of fair trade would permit" and "small businesses and American farmers and ranchers may be unable to pay down accumulated debt, to obtain working capital, or to otherwise remain viable"). Those findings, in fact, further emphasized the remedial purpose of the antidumping statute. Id. (stating that "[t]he continued dumping or subsidization of imported products ... can frustrate the remedial purpose of the laws by preventing market prices from returning to fair levels," leading Congress to conclude that "United States trade laws should be strengthened to see that the remedial purpose of those laws is achieved" (emphases added)).
 
 
 63
 Thus, none of the three Ingalls criteria supports Huaiyin-30's contention that the Byrd Amendment transformed the remedial provisions of the antidumping statute into penalties. We therefore reject Huaiyin-30's contention.
 
 IV
 
 64
 In conclusion, we see no error in the Court of International Trade's affirmance of the Department's determination. Huaiyin-30 received adequate notice, had a meaningful opportunity to participate in the administrative review, and is thus subject to the results of the proceeding. Moreover, Huaiyin-30 was not entitled to the lower duty margin assigned to the homonymous Huaiyin-5, and the Department acted within its statutory duties. Finally, the Byrd Amendment did not change the antidumping statute into a penal provision; the statute remains remedial in nature. Consequently, we affirm the trial court's judgment.
 
 AFFIRMED