SLIP OP. 04-109

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: RICHARD K. EATON, JUDGE

_____
                                                    :
ZHEJIANG NATIVE PRODUCE & ANIMAL                    :
BY-PRODUCTS IMPORT & EXPORT CORP., ET AL.,          :
                                                    :
                 PLAINTIFFS,                        :
                                                    :
         v.                                         :     COURT NO. 02-00057
                                                    :
UNITED STATES,                                      :
                                                    :
                 DEFENDANT.                         :
_____:

[United States Department of Commerce's final results pursuant to remand sustained]


                                        Dated: August 26, 2004


        *Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP* (*Bruce M. Mitchell*, *Jeffrey S. Grimson*, *Mark E. Pardo*, *Paul Figueroa*), for plaintiffs Zhejiang Native Produce & Animal By-Products Import & Export Corp., Kunshan Foreign Trade Co., China (Tushu) Super Food Import & Export Corp., High Hope International Group Jiangsu Foodstuffs Import & Export Corp., National Honey Packers & Dealers Association, Alfred L. Wolff, Inc., C.M. Goettsche & Co., China Products North America, Inc., D.F. International (USA), Inc., Evergreen Coyle Group, Inc., Evergreen Produce, Inc., Pure Sweet Honey Farm, Inc., and Sunland International, Inc.

        *Peter D. Keisler*, Assistant Attorney General, Civil Division, United States Department of Justice; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Reginald T. Blades, Jr.*); *Robert LaFrankie*, Office of Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

        *Collier Shannon Scott, PLLC* (*Michael J. Coursey*, *John M. Herrmann*), for defendant-intervenors American Honey Producers Association and Sioux Honey Association.

MEMORANDUM OPINION

*EATON*, *Judge*: This matter is before the court following remand to the United States

Department of Commerce ("Commerce"). In *Zhejiang Native Produce & Animal By-Products*

*Import & Export Corp. v. United States*, 27 CIT __, slip op. 03-151 (Nov. 21, 2003) ("*Zhejiang*

*I*"), the court remanded Commerce's determination contained in Honey From the P.R.C., 66 Fed.

Reg. 50,608 (ITA Oct. 4, 2001) ("Final Determination"), *as amended by* 66 Fed. Reg. 63,670

(ITA Dec. 10, 2001) ("Am. Final Determination"); Issues and Decision Memorandum for the

Antidumping Investigation of Honey from the P.R.C., Pub. R. Doc. 216 ("Decision Mem.").

Plaintiffs Zhejiang, et al.,[1] challenged that determination with respect to Commerce's calculation

of antidumping duty margins, its critical circumstances finding, and the reliability of certain

sources of valuation data. Jurisdiction lies pursuant to 28 U.S.C. § 1581(c) (2000); and 19

U.S.C. §§ 1516a(a)(2)(A)(i)(II) and (B)(i) (2000). For the reasons set forth below, Commerce's

determination on remand is sustained.


BACKGROUND

The relevant facts and procedural history in this case are set forth in *Zhejiang I*. A brief

summary of these is included here. Commerce conducted two separate investigations of

honey from the People's Republic of China ("PRC"), the first in 1994 ("First Investigation") and

---

[1]     The other plaintiffs are Kunshan Foreign Trade Co., China (Tushu) Super Food
Import & Export Corp., High Hope International Group Jiangsu Foodstuffs Import & Export
Corp., National Honey Packers & Dealers Association, Alfred L. Wolff, Inc., C.M. Goettsche &
Co., China Products North America, Inc., D.F. International (USA), Inc., Evergreen Coyle
Group, Inc., Evergreen Produce, Inc., Pure Sweet Honey Farm, Inc., and Sunland International,
Inc. (collectively "Plaintiffs").

the second in 2000 ("Second Investigation").[2]  The First Investigation resulted in an affirmative

preliminary determination of sales at less than fair value.  *See* Honey From the P.R.C., 60 Fed.

Reg. 14,725 (ITA Mar. 20, 1995) (notice of prelim. determination).  Subsequently, Commerce

entered into a suspension agreement with the government of the PRC.  *See* Honey From the

P.R.C., 60 Fed. Reg. 42,521 (ITA Aug. 16, 1995) (notice of suspension of investigation);

Agreement Suspending the Antidumping Investigation on Honey From the P.R.C., Aug. 2, 1995,

U.S.-P.R.C., *reprinted in* 60 Fed. Reg. at 42,522–27 ("Suspension Agreement").[3]  Issues relating

to the Suspension Agreement were the subject of the court's opinion in *Zhejiang I*.


        The Suspension Agreement expired by its terms on August 16, 2000.  Thereafter, the

---

[2]        The Second Investigation, which resulted in the Final Determination at issue here, covered

> natural honey, artificial honey containing more than 50 percent
> natural honey by weight, preparations of natural honey containing
> more than 50 percent natural honey by weight, and flavored honey.
> The subject merchandise includes all grades and colors of honey
> whether in liquid, creamed, comb, cut comb, or chunk form, and
> whether packaged for retail or in bulk form.

Final Determination, 66 Fed. Reg. at 50,610 ("Subject Merchandise").

[3]        The scope of the Suspension Agreement covered products that were nearly identical to the Subject Merchandise:

> natural honey, artificial honey containing more than 50 percent
> natural honey by weight, and preparations of natural honey
> containing more than 50 percent natural honey by weight.  The
> subject products includes all grades and colors of honey whether in
> liquid, creamed, comb, cut comb, or chunk form, and whether
> packaged for retail or in bulk form.

Suspension Agreement, 60 Fed. Reg. at 42,522.

domestic honey industry filed a petition with Commerce and the United States International

Trade Commission ("ITC"), alleging, among other things, that the honey industry was being

injured as a result of less than fair value sales of honey from Argentina and the PRC. *See*

Antidumping and Countervailing Duty Pet., Honey from Arg. and the P.R.C. (Sept. 29, 2000),

Pub. R. Doc. 1.

The Second Investigation resulted in Commerce's determination that honey from the PRC

"is being sold, or is likely to be sold, in the United States at less than fair value," Final

Determination, 66 Fed. Reg. at 50,608, and the assessment of antidumping duty margins ranging

between 25.88% and 183.80%. *See* Am. Final Determination, 66 Fed. Reg. at 63,672.

Subsequently Zhejiang filed a motion for judgment upon the agency record, and the court in

*Zhejiang I* remanded the matter to Commerce with instructions to revisit its decision to rely on an

article from the Indian newspaper, *The Tribune*[4] (the "Tribune Article" or "Tribune of India"

article), in valuing raw honey at 35 rupees per kilogram.[5] Commerce's Final Results of

---

[4]    Commerce relied upon an article that appeared in the May 1, 2000, edition of *The Tribune*, a Chandigarh, India newspaper. The article stated in relevant part: "The sale price of honey by beekeepers in India varies from Rs 25 to Rs 45 per kg whereas in countries like the USA, Argentina and Brazil, the price varies from Rs 55 to Rs 80 a kg." K. Sarangarajan, *Apiculture, a major foreign exchange earner*, THE TRIBUNE (Chandigarh, India), May 1, 2000.

[5]    Specifically, the court instructed Commerce to

> (1) determine whether the use of the Tribune Article
> results in the "valuation of [raw honey] . . . based on
> the best available information regarding the value[]
> of such factor[]," (2) should it find that it is, explain
> in detail how the use of 35 rupees per kilogram in
> determining normal value "evidences a rational and

(continued...)

Redetermination Pursuant to Remand ("Remand Results") are the subject of this opinion.

STANDARD OF REVIEW

When reviewing a final determination in an antidumping duty investigation, "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i); *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i) (2000)) ("As required by statute, [the court] will sustain the agency's antidumping determinations unless they are 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'"). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Huaiyin*, 322 F.3d at 1374 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The existence of substantial evidence is determined "by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of

_____

[5](...continued)

> reasonable relationship to the factor of production it represents," (3) no matter whether it continues to use the Tribune Article or other sources, fully and completely justify any sources of data as the "best available information" for the finding such data are used to support, and (4) should any resulting calculation of normal value of honey from the PRC exceed that of the weighted-average of the honey unit import values from all other countries during the POI, explain in detail how this furthers the goal of estimating antidumping duty margins as accurately as possible.

*Zhejiang I*, slip op. 03-151 at 45–46 (internal citations omitted).

the evidence.'" *Id.* (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)). "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations omitted).

DISCUSSION

Pursuant to the court's instructions to revisit its decision to value raw honey at 35 rupees per kilogram based on the Tribune Article, Commerce conducted remand proceedings and concluded that

> the Department's determination to use the publicly-available raw honey information from the Tribune of India article to calculate respondents' normal value is (1) based on the "best available information," (2) evidences a "rational and reasonable relationship to the factor of production it represents," and (3) furthers our goal of estimating antidumping duty margins as accurately as possible.[6]

Remand Results at 25. Plaintiffs argue here that Commerce has not demonstrated that the Tribune Article is the "best available information" to value raw honey, and that Commerce has failed to explain how its valuation of raw honey was reasonable. *See generally* Pls.' Comments Regarding Remand Determination ("Pls.' Comments"). The court will address each argument in turn.

---

[6]     Where the subject merchandise is exported from a nonmarket economy ("NME") country such as the PRC, normal value is constructed from values for the factors of production used in producing the merchandise in a comparable market economy country, or surrogate. *See* 19 U.S.C. § 1677b(c)(1). An NME country is defined as "any foreign country that the administering authority determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A).

I.      *Commerce's use of the* Tribune of India *article to value raw honey is in accordance with law and supported by substantial evidence*

Among the factors of production valued by Commerce was raw honey.  In valuing raw honey, Commerce "used an average of the highest and lowest price for raw honey given in [the Tribune Article] . . . ."  Honey From the P.R.C., 66 Fed. Reg. 24,100, 24,106 (ITA May 11, 2001) (prelim. determination).  Commerce stated:

> The raw honey price data from *The Tribune of India* is the best available surrogate value for the following reasons: 1) it is the most contemporaneous, dated May 1, 2000; 2) the broad-based data is specific to Indian raw honey prices (i.e., generally Indian honey, like PRC raw honey, has a high moisture content); and 3) it is quality agricultural data.  We do not find that the prices offered by petitioners and respondents offer more accurate or representative alternatives.

Decision Mem., Pub. R. Doc. 216 at 21.  With respect to Commerce's decision, the court in *Zhejiang I* stated:

> In deciding to use the Tribune Article, Commerce rejected a study published by the Agriculture and Processed Food Products Export Development Authority ("APEDA Study"), finding that "the values in . . . the APEDA study submitted by respondents . . . suffer from inherent weaknesses not present in the prices reflected in *The Tribune of India.*"

*Zhejiang I*, slip op. 03-151 at 40 (internal citation omitted).  The court agreed that the *Tribune of India* article appeared to be more reliable than the APEDA Study offered by Plaintiffs, stating:

> As between the source of data relating to the price of honey Commerce selected, and that offered by Plaintiffs, Commerce appears to have used the more reliable source.  The Tribune Article addresses the sale price of honey, whereas the table in the APEDA Study from which Plaintiffs identify the "average value of honey" appears in the context of a discussion concerning the development of a model for "doubl[ing] the number of bee colonies every 2 years," not determining the value of honey.  The publication of the

> Tribune Article, dated May 1, 2000, coincides with the [period of investigation]. The APEDA Study, in contrast, bears the year 1999. . . . Moreover, the Tribune Article, published on *The India Tribune*'s Web site, was publicly available, while Plaintiffs make no such argument with respect to the APEDA Study. *See* 19 C.F.R. § 351.408(c)(1) ("The Secretary normally will use publicly available information to value factors.").

*Id*. at 42–43 (internal citations and footnote omitted). The court nevertheless found that "the results reached by applying the data from the Tribune Article [we]re sufficiently incredible so as to call into question their reliability." *Id*. at 43.


On remand, Commerce was instructed to "determine whether the use of the Tribune Article results in the valuation of [raw honey] . . . based on the best available information regarding the value[] of such factor[] . . . ." *Zhejiang I*, slip op. 03-151 at 45 (internal citation omitted). In the Remand Results, Commerce continues to insist that the Tribune Article was the best source of information for valuing raw honey:

> We have revisited our decision and find that the Tribune of India article is the best available information to value raw honey. In selecting the pricing information from the Tribune of India article as the most appropriate surrogate value to represent raw honey prices in India, the Department reasons that the raw honey pricing data in this article is the best quality data because (1) it is published, publicly-available data; (2) it was "intended to serve the Indian agribusiness community;"[7] and (3) it is representative of the beekeeping honey industry in India. Therefore, the information in this article has "greater credibility" than would a similar article published only as a "general interest" article.

Remand Results at 10 (internal citation omitted). Commerce further explained that, in addition

---

[7]     Apparently, Commerce makes this claim based on the Tribune Article having been republished in the Agricultural Edition of the *Tribune*. *See* Remand Results at 15.

to the foregoing reasons, it chose the Tribune Article because

> a critical factor in determining which surrogate value is the most
> specific or comparable to the raw honey input consumed by PRC
> honey processors is moisture content. This is important to consider
> because more raw honey will be consumed during the production
> process to reduce the moisture content to an acceptable level. As
> the record indicates, Indian raw honey generally has a high
> moisture content. Therefore, the Department finds that the
> country-wide raw honey prices from the <u>Tribune of India</u> article are
> the most specific to the raw honey consumed by honey processors
> in the PRC (<u>i.e.</u>, generally, both have high moisture contents).

*Id.*[8]

Commerce also considered, but rejected, the source provided by defendant-intervenors

American Honey Producers Association and Sioux Honey Association, i.e., the 1999–2000

financial statement of an Indian Honey Cooperative, Mahabaleshwar Honey Producers

Cooperative Society, Ltd. ("MHPC"). With regard to the MHPC data, Commerce stated:

> The Department determines that the average raw honey price from
> the MHPC is not representative of raw honey prices in India
> pursuant to 19 U.S.C. §1677b(c)(1)(B). As the Department stated
> in the <u>Final Determination</u>, "although, the MHPC is a cooperative,
> and hence likely buys raw honey from various sources, the value
> for raw honey reported on its financial statement represents the
> value as experienced by a single processor of honey in a particular
> region of India." And, as already noted above, the Department
> prefers to use industry-wide values, rather than the values of a
> single producer, wherever possible, because industry-wide values
> are more representative of prices/costs of all producers in the
> surrogate country. Since the average raw honey price from the
> MHPC's financial statement was based on information obtained

---

[8]        In other words, Commerce chose the Tribune Article, in part, because, in terms of moisture content, Indian honey is generally similar to Chinese honey. In order to ensure that the moisture content would be reflected in prices, however, Commerce concluded that a country-wide rather than a regional surrogate price was needed.

> from a single processor, it is not representative of all producers in
> India.  Therefore, the MHPC average raw honey price is neither
> more accurate nor more reliable than the data from the Tribune of
> India article.

Remand Results at 13 (internal citation omitted).

Finally, Commerce pursued its own search for potential sources for valuing raw honey.

Commerce stated:

> As indicated by the record, we only located the republished
> Tribune of India article (in its Agricultural Edition) dated May 1,
> 2000.  Our search for a suitable surrogate revealed no additional
> reliable or credible information on valuing raw honey in India other
> than the Tribune of India article; thus, we continued to rely on the
> published raw honey values appearing in the Tribune of India
> article as the basis for calculating the final surrogate raw honey
> price . . . .

Remand Results at 14–15 (internal citation omitted).  Thus, having rejected the sources proposed

by the parties, and unable to find any additional reliable or credible sources of its own,

Commerce concluded that

> the surrogate value information from the Tribune of India article
> offers the most accurate and reliable calculation of plaintiffs'
> normal value pursuant to 19 U.S.C. § 1677b(c).  The Tribune of
> India article constitutes the most reliable source on the record, and
> is a publicly-available article printed in a widely-distributed and
> established Indian newspaper . . . .  [B]ecause the data itself is the
> most representative of raw honey prices in India, and is quality data
> that is contemporaneous with the POI, as well as specific to the
> raw honey industry in India, the Department determines that it has
> relied upon the "best available information" on the record of these
> proceedings in valuing the raw honey input.

*Id*. at 15 (footnote omitted).

For their part, Plaintiffs continue to assert that the APEDA study should serve as the basis for raw honey valuation, arguing that "[t]he only difference between the two documents is that the APEDA study is far more detailed and demonstrates a much greater and more comprehensive knowledge of the Indian honey industry." Pls.' Comments at 4.

As previously noted, the court's views with respect to the APEDA study were stated in *Zhejiang I* and will not be repeated here beyond restating that, "[a]s between the [Tribune Article] and th[e] [APEDA study], Commerce appears to have used the more reliable source." *Zhejiang I*, slip op. 03-151 at 42. Plaintiffs offer nothing in their Comments to cause the court to reconsider this conclusion.

Pursuant to 19 U.S.C. § 1677b(c), Commerce is required to base the valuation of the factors of production in NME cases "on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by [Commerce]." *Id*. Although the statute does not define "best available information," it provides that Commerce "shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are[:] (A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4). "[T]he statute grants Commerce broad discretion to determine the 'best available information' in a reasonable manner on a case-by-case basis." *Peer Bearing Co. v. United States*, 25 CIT 1199, 1208, 182 F. Supp. 2d 1285, 1298 (2001) (citing *Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1446 (Fed. Cir. 1994));

*see also Shakeproof Assembly Components, Div. of Ill. Tool Works v. United States*, 268 F.3d

1376, 1382 (Fed. Cir. 2001) ("[T]he critical question is whether the methodology used by

Commerce is based on the best available information and establishes antidumping margins as

accurately as possible.").

With respect to the source offered by defendant-intervenors, the court finds proper

Commerce's decision to reject the average raw honey price calculated from MHPC's 1999–2000

financial statement, on the grounds that the value for raw honey reported on the financial

statement represents the value for raw honey "as experienced by a single processor of honey in a

particular region of India." Remand Results at 13 (internal citation omitted). Commerce

"prefers to use industry-wide values, rather than the values of a single producer, wherever

possible . . . ." *id*.; *see also Peer Bearing Co.*, 25 CIT at 1217, 182 F. Supp. 2d at 1307

("Commerce asserts that it does not focus upon a particular surrogate producer of subject

merchandise if more objective, industry-wide values . . . are available because . . . Commerce's

goal is to use surrogate values that represent the industry norm of the surrogate country, not

company-specific surrogate values . . . ."). Furthermore, the MHPC financial statement

represents the average price paid to its members for raw honey during a nine-month period that

predates the POI in this case. Commerce rightly favors data contemporaneous with the POI over

that which is not. *See id.* ("Commerce prefers to value factors using public information that is

most closely concurrent to the specific period of review . . . ."). Thus, because the data contained

in MHPC's 1999–2000 financial statement neither represents an industry-wide value nor

comports with the POI, the court finds that Commerce properly rejected it. *See, e.g.*, *Writing*

*Instrument Mfrs. Ass'n, Pencil Sec. v. United States*, 21 CIT 1185, 1202, 984 F. Supp. 629, 644

(1997) (approving Commerce's chosen source for surrogate value information where the only

source submitted by plaintiffs lacked the "inherent reliability" of Commerce's source).

Finally, as already noted, Commerce "pursued its own search for potential surrogate

values to value the raw honey input." Remand Results at 14. With respect to that search,

Commerce stated that it "revealed no additional reliable or credible information on valuing raw

honey in India other than the Tribune of India article . . . ." *Id*.

For the foregoing reasons, the court finds that Commerce has complied with the court's

remand instruction to "determine whether the use of the Tribune Article results in the 'valuation

of [raw honey] . . . based on the best available information regarding the value[] of such factor[] .

. . .'" *Id*. at 45 (internal citation omitted). In addition, the court finds that Commerce's decision

to use the data from the Tribune Article is in accordance with law and supported by substantial

evidence.

II.      *Commerce's decision to value raw honey at 35 rupees per kilogram is reasonable*

Also on remand, Commerce was instructed to revisit its decision to value raw honey at 35

rupees per kilogram based on the data found in the Tribune Article. Commerce reached that

figure "based on a simple average of all raw honey pricing information from that article. In other

words, the Department took the highest and lowest values in the Tribune of India article, and

then averaged them together (i.e., (25 Rs./kg. + 45 Rs./kg.)/2 = 35 Rs./kg.)." Remand Results at

16.  In *Zhejiang I*, the court found that, although the Tribune Article was the better of the two

proffered sources, the results reached by applying the data from it were "sufficiently incredible so

as to call into question their reliability." *Zhejiang I*, slip op. 03-151 at 43.  The court stated:

> In accordance with the Suspension Agreement, the minimum price
> at which honey could be sold during the POI was equal to 92% of
> the weighted-average of the honey unit import values from all
> other countries.  Thus, taking Zhejiang's data as an example, the
> weighted-average of honey unit import values from all other
> countries during the POI would have been approximately $932.25
> per metric ton.  Using a price of 35 rupees per kilogram, however,
> Commerce calculated normal value for Zhejiang to be $1,001.99
> per metric ton . . . .  Thus, the weighted-average of the honey unit
> import values from all other countries was approximately $69.74
> less than Commerce's calculation of the normal value of honey
> sold by Zhejiang.  Because raw honey is by far the most important
> factor of production, its valuation appears to be the most
> anomalous.  As MOFTEC[9] put it in a letter to Commerce, "This
> conclusion implies that the whole world was dumping honey
> during [the POI], which is irrational."  While it is possible that the
> PRC is the worldwide high cost producer of honey, the very
> magnitude of the difference between Commerce's calculation of
> normal value and the weighted-average of honey unit import values
> from all other countries during the POI, calls into question
> Commerce's methodology and the evidence on which it relied.

*Id*. at 44–45 (footnotes and internal citations omitted).  In other words, the data appeared to

indicate that Zhejiang's constructed cost of *producing* honey was higher than the price for which

the other countries were able to *sell* honey.


As to the court's concerns regarding this apparently anomalous result, Commerce argues

that the prices resulting from the Suspension Agreement were distorted by the large volume of

---

[9]     The Ministry of Foreign Trade and Economic Cooperation ("MOFTEC") is a
Chinese governmental agency responsible for foreign trade, economic cooperation, and foreign
investment.

dumped imports from Argentina during the POI. Commerce explained:

> [T]his large volume of lower priced honey imports from Argentina distorted the suspension agreement prices. This is evident from the fact that, under the suspension agreement reference price calculations (i.e., weighted average price of U.S. imports from all countries, excluding the PRC), Argentina's imports accounted for approximately 76 percent (by volume) of the reference price calculations. Given the predominant impact of Argentine imports on the reference price calculations, the drop in Argentine prices "drove down the suspension agreement prices" lower than they should have been.

Remand Results at 23–24.

Commerce has provided various tables demonstrating the changes resulting from removing the data from Argentina. Once this exercise has been performed, the unit import value for all countries excluding Argentina and the PRC during the POI equals $1,264.56 per metric ton or $163.67 more than the calculated normal value for Zhejiang. Thus, while "the whole world" may not have been dumping honey, Argentina's sales were such a large portion of imports that they distorted the results. This being the case, the anomaly identified by the court is removed. In light of Commerce's further explanation and the explanatory calculations, the court finds that Commerce's decision to use a simple average of 35 rupees, as derived from the Tribune of India article, is supported by substantial evidence and in accordance with law. *See, e.g., Rhodia, Inc. v. United States*, 25 CIT 1278, 1285, 185 F. Supp. 2d 1343, 1350 (2001) ("The general practice of Commerce [in calculating surrogate values] is to apply a simple average. In order to depart from this practice, Commerce needs to 'explain the reasons for its departure.'") (internal citation omitted). "As long as the agency's methodology and procedures are reasonable

means of effectuating the statutory purpose, and there is substantial evidence in the record

supporting the agency's conclusions, the court will not impose its own views as to the sufficiency

of the agency's investigation or question the agency's methodology." *Ceramica Regiomontana,*

*S.A. v. United States*, 10 CIT 399, 404–05, 636 F. Supp. 961, 966 (1986), *aff'd* 810 F.2d 1137

(Fed. Cir. 1987).

CONCLUSION

Based on the foregoing, Commerce's final results pursuant to remand are sustained in

their entirety, and this case is dismissed.  Judgment shall be entered accordingly.

                                                          _____/s/ Richard K. Eaton_____
                                                                    Richard K. Eaton

Dated: August 26, 2004
          New York, New York