**Slip Op. 04-47**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

_____
CRAWFISH PROCESSORS ALLIANCE;          :
LOUISIANA DEPARTMENT OF                :
AGRICULTURE AND FORESTRY;              :
BOB ODOM, COMMISSIONER,                :
                                       :
        Plaintiffs,                    :
                                       :
        v.                             :
                                       :
UNITED STATES,                         :
                                       :
        Defendant,                     :
                                       :
        and                            :       Consol. Court No.
                                       :       02-00376
HONTEX ENTERPRISES, INC., d/b/a        :
LOUISIANA PACKING COMPANY;             :
QINGDAO RIRONG FOODSTUFF CO., LTD.     :
and YANCHENG HAITENG AQUATIC           :
PRODUCTS & FOODS CO., LTD;             :
BO ASIA, INC., GRAND NOVA              :
INTERNATIONAL, INC., PACIFIC           :
COAST FISHERIES CORP.,                 :
FUJIAN PELAGIC FISHERY GROUP CO.,      :
QINGDAO ZHENGRI SEAFOOD CO., LTD.      :
and YANGCHENG YAOU SEAFOOD CO.,        :
                                       :
        Defendant-Intervenors          :
        and Plaintiffs.                :
_____:

     This consolidated action concerns the motion of plaintiffs, Crawfish Processors Alliance, Louisiana Department of Agriculture and Forestry, and Bob Odom, Commissioner (collectively "CPA") and plaintiffs and defendant-intervenors, Hontex Enterprises, Inc., d/b/a Louisiana Packing Company ("Hontex"), Qingdao Rirong Foodstuff Co., Ltd. ("Qingdao"), Yancheng Haiteng Aquatic Products & Foods Co., Ltd. ("Yancheng"), Bo Asia, Inc. ("Bo Asia"), Grand Nova International, Inc. ("Grand Nova"), Pacific Coast Fisheries Corp. ("Pacific Coast"), Fujian Pelagic Fishery Group Co. ("Fujian") and Yangcheng Yaou Seafood Co. ("Yaou") (collectively "Plaintiffs/Defendant-Intervenors"), pursuant to USCIT R. 56.2 for judgment upon the agency record challenging various aspects of the United States Department of Commerce, International Trade

Administration's ("Commerce") final results entitled <u>Notice of Final Results of Antidumping Duty Administrative Review, and Final Partial Recission of Antidumping Duty Administrative Review of Freshwater Crawfish Tail Meat from the People's Republic of China</u> ("<u>Final Results</u>"), 67 Fed. Reg. 19,546 (Apr. 22, 2002).

Specifically, Plaintiffs/Defendant-Intervenors contend that Commerce's determination to select Australia as the appropriate surrogate country for valuation of whole live crawfish was not supported by substantial evidence or in accordance with law. CPA argues that Commerce's determination to use the list prices from a single Australian company was not the "best available information" of prices for crawfish used in the production of tail meat exported by Chinese crawfish companies. Additionally, CPA complains that Commerce improperly rejected information submitted regarding a possible affiliation between Qingdao and another Chinese crawfish exporter. Qingdao and Yancheng contend that Commerce erred in its application of a dry-to-wet weight conversion ratio to the crawfish shells by-product factor calculation. Hontex complains that Commerce improperly rejected certain Hontex filings as untimely submitted new factual information, and that Commerce erred in assigning a single rate to Ningbo Nanlian ("Nanlian") and Jiangsu Hilong International Trading Company, Ltd. ("Jiangsu"). Bo Asia, Grand Nova, Pacific Coast, Fujian, Yaou and Hontex also complain that Commerce's failure to issue a timely final determination renders the <u>Final Results</u> void <u>ab initio</u>. Bo Asia, Grand Nova, Pacific Coast, Fujian and Yaou contend that: (1) Commerce failed to find that Fujian and Pacific Coast were "affiliated" parties; (2) Commerce erred in assigning Yaou an "adverse facts available" margin; and (3) the statutory provisions for the disbursement of collected antidumping duties to domestic interested parties require Commerce to change its procedures during the administrative review at issue.

**Held:** CPA and Plaitiff/Defendant-Intervenors' 56.2 motion is granted in part and denied in part. Case remanded to Commerce with instructions to (1) include the submissions made by Hontex on March 19, 2002, and March 20, 2002, as part of the administrative record and explain what bearing, if any, these submissions have on Commerce's final determination; and (2) sufficiently articulate (a) why its collapsing methodology for non-market economy exporters is a permissible interpretation of the antidumping duty statute; and (b) why its findings warranted the collapsing of Jiangsu and Nanlian.

Date: May 6, 2004

Adduci, Mastriani & Schaumberg, L.L.P. (Will E. Leonard and John C. Steinberger) for Crawfish Processors Alliance, Louisiana Department of Agriculture and Forestry, and Bob Odom, Commissioner, plaintiffs.

Coudert Brothers LLP (John M. Gurley and Matthew J. McConkey) for Hontex Enterprises, Inc., d/b/a Louisiana Packing Company, plaintiff and defendant-intervenor.

White & Case (William J. Clinton, Adams C. Lee and Jonathan Seiger) for Qingdao Rirong Foodstuff Co., Ltd. and Yancheng Haiteng Aquatic Products & Foods Co., Ltd., plaintiffs and defendant-intervenors.

Garvey Schubert Barer (William E. Perry, Lizabeth R. Levinson and John C. Kalitka) for Bo Asia, Inc., Grand Nova International, Inc., Pacific Coast Fisheries Corp., Fujian Pelagic Fishery Group Co., Qingdao Zhengri Seafood Co., Ltd. and Yangcheng Yaou Seafood Co., plaintiffs and defendant-intervenors.

Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (David S. Silverbrand); of counsel: Arthur D. Sidney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for the United States, defendant.

## OPINION

**TSOUCALAS, Senior Judge:**  This consolidated action concerns the motion of plaintiffs, Crawfish Processors Alliance, Louisiana Department of Agriculture and Forestry, and Bob Odom, Commissioner (collectively "CPA") and plaintiffs and defendant-intervenors, Hontex Enterprises, Inc., d/b/a Louisiana Packing Company ("Hontex"), Qingdao Rirong Foodstuff Co., Ltd. ("Qingdao"), Yancheng Haiteng Aquatic Products & Foods Co., Ltd. ("Yancheng"), Bo Asia, Inc. ("Bo Asia"), Grand Nova International, Inc. ("Grand Nova"), Pacific Coast Fisheries Corp. ("Pacific Coast"), Fujian

Pelagic Fishery Group Co. ("Fujian") and Yangcheng Yaou Seafood Co. ("Yaou") (collectively "Plaintiffs/Defendant-Intervenors"),[1] pursuant to USCIT R. 56.2 for judgment upon the agency record challenging various aspects of the United States Department of Commerce, International Trade Administration's ("Commerce") final results entitled <u>Notice of Final Results of Antidumping Duty Administrative Review, and Final Partial Recission of Antidumping Duty Administrative Review of Freshwater Crawfish Tail Meat from the People's Republic of China</u> ("<u>Final Results</u>"), 67 Fed. Reg. 19,546 (Apr. 22, 2002).

Specifically, Plaintiffs/Defendant-Intervenors contend that Commerce's determination to select Australia as the appropriate surrogate country for valuation of whole live crawfish was not supported by substantial evidence or in accordance with law. CPA argues that Commerce's determination to use the list prices from a single Australian company was not the "best available information" of prices for crawfish used in the production of tail meat exported by Chinese crawfish companies. Additionally, CPA complains that Commerce improperly rejected information submitted regarding a possible affiliation between Qingdao and another Chinese crawfish

---

[1] The Court notes that while Qingdao Zhengri Seafood Co., Ltd. ("Qingdao Zhengri") filed a complaint against the United States, it did not file with the Court a motion pursuant to USCIT R. 56.2 for judgment upon the agency record.

exporter. Qingdao and Yancheng contend that Commerce erred in its application of a dry-to-wet weight conversion ratio to the crawfish shells by-product factor calculation. Hontex complains that Commerce improperly rejected certain Hontex filings as untimely submitted new factual information, and that Commerce erred in assigning a single rate to Ningbo Nanlian ("Nanlian") and Jiangsu Hilong International Trading Company, Ltd. ("Jiangsu"). Bo Asia, Grand Nova, Pacific Coast, Fujian, Yaou and Hontex also complain that Commerce's failure to issue a timely final determination renders the Final Results void ab initio. Bo Asia, Grand Nova, Pacific Coast, Fujian and Yaou contend that: (1) Commerce failed to find that Fujian and Pacific Coast were "affiliated" parties; (2) Commerce erred in assigning Yaou an "adverse facts available" margin; and (3) the statutory provisions for the disbursement of collected antidumping duties to domestic interested parties require Commerce to change its procedures during the administrative review at issue.

### BACKGROUND

The administrative review at issue involves the period of review ("POR") covering September 1, 1999, through August 31, 2000.[2] See Final Results, 67 Fed. Reg. at 19,546. Commerce

---

[2] Since the administrative review at issue was initiated after December 31, 1994, the applicable law is the antidumping

published the preliminary results of the subject review on October 12, 2001. See Notice of Preliminary Results of Antidumping Duty Administrative Review and Preliminary Partial Recision of Antidumping Duty Administrative Review of Freshwater Crawfish Tail Meat From the People's Republic of China ("Preliminary Results"), 66 Fed. Reg. 52,100.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a (2000) and 28 U.S.C. § 1581(c) (2000).

## STANDARD OF REVIEW

The Court will uphold Commerce's final determination in an antidumping administrative review unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(I) (1994); see NTN Bearing Corp. of Am. v. United States, 24 CIT 385, 389-90, 104 F. Supp. 2d 110, 115-16 (2000) (detailing Court's standard of review in antidumping proceedings).

---

statute as amended by the Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809 (1994) (effective January 1, 1995). See Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir. 1995) (citing URAA § 291(a)(2), (b) (noting effective date of URAA amendments)).

**DISCUSSION**

**I.   Commerce Properly Determined to Select Australia as the Surrogate Country for Valuation of Whole Live Freshwater Crawfish**

**A.   Contentions of the Parties**

**1.   Plaintiff/Defendant-Intervenors' Contentions**

Plaintiff/Defendant-Intervenors generally contend that Commerce erred in rejecting Spain and choosing Australia as the source of surrogate values for live crawfish. See Pls. Qingdao Yancheng R. 56.2 Mot. J. Upon Agency R. ("Qingdao & Yancheng's Mem.") at 8-25; Br. Supp. Pls.' Mot. J. Agency R. ("Bo Asia's Br.") at 27-30; Mem. Supp. Mot. J. Upon Agency R. ("Hontex's Mem.") at 4-15. Bo Asia, Grand Nova, Fujian and Yaou (collectively "Bo Asia et al.") add that Commerce ignored the best available information on the record by choosing Australian data rather than data from Mexico, a country with an economy more comparable to China. See Bo Asia's Br. at 29-30.

Specifically, Qingdao, Yancheng and Hontex first assert that Commerce abandoned its prior practice of using Spanish import data to establish the surrogate value for live crawfish. See Qingdao & Yancheng's Mem. at 9-10; Hontex's Mem. at 10. Qingdao and Yancheng further contend that Commerce must meet a high evidentiary standard and thoroughly explain its reasons for departing from its prior practice. See Qingdao & Yancheng's Mem. at 15. Commerce's

rejection of Spanish data was based upon the observation that import data used in previous reviews indicated a drastic decline in the amount of imports of live crawfish into Spain from Portugal. See Qingdao & Yancheng's Mem. at 10. Commerce failed to articulate its reasons for discontinuing the use of Spanish import data and why it rejected all forms of data on Spanish prices for live crawfish. See id. at 10-11. Moreover, Qingdao and Yancheng maintain that Commerce should have considered other sources of Spanish data that could be substituted for the Spanish import data used in previous reviews. See id. at 11.

Second, Qingdao, Yancheng and Hontex take issue with Commerce's reasons for rejecting alternative Spanish crawfish data submitted by interested parties. See id. at 15-17; Hontex's Mem. at 6-9. Contrary to Commerce's determination, the data entitled Estudio Sobre el Impacto Económico del Sector de Congrejo de Rio en Andalucia (the "Spanish Study") was an official government report sanctioned by the regional government of Andalusia, which "approved the study, developed and issued the questionnaire that was used to collect data used in the study, and financed the printing of both the questionnaire and the eventual study." Qingdao & Yancheng's Mem. at 16; see also Hontex's Mem. at 6. Hontex asserts that "[n]owhere in the record is it apparent that the [Spanish Study] was not a 'government product at all.'" Hontex's Mem. at 7. In

addition, Commerce has traditionally relied on similar broad, industry-wide averages and estimates as surrogate values. See Qingdao & Yancheng's Mem. at 17-19. The data contained in the Spanish Study demonstrates that Spain was an important market for live crawfish during the POR, "so that prices of that input could reasonably be used as surrogate values in this proceeding." Id. at 17. Accordingly, Qingdao, Yancheng and Hontex complain that Commerce improperly determined that the Spanish Study was unreliable and rejected the use of Spanish prices to establish the surrogate value for live crawfish.

Third, Qingdao and Yancheng argue that Commerce "erred in failing to ensure that the [Spanish Study] really was unacceptable as a source of surrogate data before moving on to use the Australian yabby surrogate value data." Id. at 25. Qingdao and Yancheng further complain that Commerce failed to collect the same type of information regarding crawfish and the crawfish tail meat industries during its trip to Spain and Australia. See id. at 21-25. Commerce's analysts during their respective trips "met and interviewed the same types of government officials and industry representatives in both countries, [yet they] failed to ask them the same, or even comparable, questions." Id. at 22. Commerce, for example, failed to collect and report the price of live crawfish in Spain while it did so during its Australia trip. See

id. Qingdao & Yancheng deduce that Commerce's divergent approach to the Spanish Study and data from Australia "demonstrates clearly that [Commerce's] decision to reject the [Spanish Study], and hence Spain as a source for price data on which to establish a surrogate value for live crawfish, was arbitrary and not supported by substantial evidence." Id. at 24.

Commerce's regulations require it to use prices or costs of factors of production ("FOP") in a market economy that is comparable in economic development with the non-market economy ("NME") country under investigation. See Hontex's Mem. at 10 (citing 19 C.F.R. § 351.408(b) (1999)). Here, record evidence indicates that Spain and not Australia is closer to China's economic development and, therefore, the better source of surrogate value data for live crawfish. See Hontex's Mem. at 10-11. Hontex asserts that "[s]ince Spain's per capita income is closer to China than that of Australia, if the surrogate data is equally valid, then the statutory preference is for Spain." Hontex's Mem. at 11 (emphasis in original). The growing season, species and genus of crawfish harvested by Spain is identical to that in China, while such is not the case for Australia. See id. at 14; Qingdao & Yancheng's Mem. at 24-25. While Commerce "prefers to use surrogate data for identical merchandise," here Commerce used the price for Australian yabbies, which is not identical merchandise. Hontex's

Mem. at 14 (emphasis in original).  In Australia, the "'yabby' is harvested and sold predominantly in live form, and is not typically processed into tail meat . . . [while in Spain,] the majority of live crawfish are used for processing."  Qingdao & Yancheng's Mem. at 13.  While Australian processors use only the smallest or deformed yabbies, Spanish processors, like those in China, use all sizes of crawfish to produce tail meat.  See id. at 13-14. Consequently, Spain's prices for live crawfish are more similar to those in China and, therefore, are the "best available" surrogate values.

Qingdao and Yancheng concede that prices of live crawfish in Spain were lower than prices in Australia.  See id. at 12-13.  They argue, however, that prices in Spain were not aberrational in comparison to world market prices.  See id.  The prices Commerce used "were likely artificially high and inappropriate for use to establish surrogate values for live crawfish input into crawfish tail meat production."  Id. at 13.  Hontex argues that Commerce improperly relied on Australian prices for live crawfish "that were based on a relatively insignificant quantity."  Hontex's Mem. at 12.  While Spain produced 2,721 metric tons of live crawfish during the POR, Australia only produced 419 metric tons of live crawfish during the same period.  See id.  In addition, Commerce "relied upon a single price from a single producer in Australia," whereas

the Spanish Study "accounts for a whole industry, not a single supplier, and covers the whole POR, not a specific moment in time during the POR." Id. at 13 (emphasis in original). Consequently, Spanish data is superior to the Australian data used by Commerce because it "is more representative of what the price of whole live crawfish would be in China if that price was set up by market price." Id. In subsequent reviews, Commerce has returned to using Spanish data to establish surrogate values for live crawfish, which shows that the use of Australian data was wrong. See id. at 14-15.

Bo Asia et al. alternatively argue that the record supports the use of prices from Mexico to establish the surrogate value for live crawfish. See Bo Asia's Br. at 27-30. There is evidence establishing the existence of a commercial crawfish industry in the Mexican State of Veracruz, and the exportation of frozen crawfish tail meat to the United States. See id. at 27-28. Bo Asia et al. maintain that, based on gross national income ("GNI") per capita data obtained from the World Bank, Mexico is closer to China than Australia in terms of economic development. See id. at 29. Consequently, if Spanish data is not used to establish surrogate values, then Mexican data for live crawfish is the "best available information." See id. at 29-30.

### 2. Commerce's Contentions

Commerce responds that its decision to use Australia as the

surrogate country to value the crawfish input is supported by record evidence and in accordance with law. See Def.'s Mem. Opp. Pls.' Mots. J. Upon Agency R. ("Commerce's Mem.") at 14-27. Commerce is only required, to the extent possible, to select a surrogate country with economic development comparable to that of China. See id. at 14. While Australia's economic development was substantially higher than China's, Commerce used Australia because it was the only market economy country with significant production of comparable merchandise. See id. at 16-17. Commerce's regulations "anticipate the possibility of using market economy countries that are not at a level of economic development comparable to China." Id. at 16. Commerce opines that Australia's annual crawfish production of approximately 290 metric tons was significant for its purposes. See id. at 19. In considering whether Australian yabbies are comparable to Chinese crawfish, Commerce determined that yabbies are generally larger. See id. at 17. Commerce found, however, that Australian yabbies weighing 30 to 40 grams or blemished yabbies were comparable to Chinese crawfish in size and constituted the "best available information." See id. at 26.

Commerce asserts that it considered record evidence regarding Spanish and Mexican price data, but found that Australian data was the "best available information." See id. at 17. Commerce

maintains that the Spanish Study was not a government report because it was paid for by the owner of a crawfish processor, which competes with other Andulician crawfish processors. See id. at 18. Furthermore, the Spanish Study did not contain complete price data and was based on estimates rather than actual transactions. See id. If interested parties "wanted Commerce to consider 'alternative' Spanish prices, it was incumbent upon them to provide price data to Commerce." Id. at 20. Based on these findings, Commerce determined that the Spanish data was not reliable and, therefore, not the "best available information." See id. at 19.

With regard to Mexico, Commerce determined that it was not a significant producer of comparable merchandise. See id. at 20. Record evidence did not establish that Mexico had a commercial freshwater crawfish industry. See id. at 21. Commerce found that statistics gathered by the local Mexican government "are not limited to crawfish, are not collected regularly, and are not representative because these statistics are limited to only two months." Id. at 22. Consequently, Commerce contends that it properly determined that Mexican crawfish price data was also not the "best available information."

### B.   Analysis

The Court's role in the case at bar is not to evaluate whether the information Commerce used was the best available, but rather

whether Commerce's choice of information is reasonable.[3] See China Nat'l Mach. Imp. & Exp. Corp. v. United States, 27 CIT ___, ___, 264 F. Supp. 2d 1229, 1236 (2003). Commerce's discretion in choosing its information is limited by the statute's ultimate goal "to construct the product's normal value as it would have been if the NME country were a market economy country." Rhodia Inc. v. United States, 25 CIT ___, ___, 185 F. Supp. 2d 1343, 1351 (2001). While Commerce enjoys broad discretion in determining what constitutes the best information available to calculate NV, Commerce may not act arbitrarily in reaching its decision. If Commerce's determination of what constitutes the best available information is reasonable, then the Court must defer to Commerce. Here, Commerce's determination of what constitutes the best available information is based on sound reasoning. For the reasons set forth below, the Court finds that Commerce's determinations—that the Spanish data was unreliable and that Mexico was not a significant producer of comparable merchandise—were reasonable.

---

[3] The statute's silence regarding the definition of "best available information" provides Commerce with "broad discretion to determine the 'best available information' in a reasonable manner on a case-by-case basis." Timken Co. v. United States, 25 CIT ___, ___, 166 F. Supp. 2d 608, 616 (2001). Furthermore, in evaluating the data, the statute does not require Commerce to follow any single approach. See Luoyang Bearing Factory v. United States, 26 CIT ___, ___, 240 F. Supp. 2d 1268, 1284 (2002).

In conducting an administrative review, Commerce determines the antidumping duty margin by taking the difference between the normal value ("NV") and the United States price of the merchandise. When merchandise is produced in an NME country, such as the People's Republic of China ("PRC"), there is a presumption that exports are under the control of the state. Section 1677b(c) of Title 19 of the United States Code provides that, "the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by [Commerce]." 19 U.S.C. § 1677b(c)(1) (1994). The statute, however, does not define the phrase "best available information," it only provides that, "[Commerce], in valuing factors of production . . . shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are—(A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4). To determine the comparability of a market economy country's economic development with that of an NME country, Commerce "will place primary emphasis on per capita GDP as the measure of economic comparability." 19 C.F.R. § 351.408(b) (1999). Nonetheless, Commerce is given broad discretion "to determine margins as accurately as possible, and to use the best information

available to it in doing so." Lasko Metal Prods., Inc. v. United States, 43 F.3d 1442, 1443 (Fed. Cir. 1994).

The antidumping duty statute authorizes, but does not mandate that Commerce use surrogate countries to estimate the value of the FOP. In legislative history, Congress provided Commerce with guidance by stating that, "in valuing such [FOP], Commerce shall avoid using any prices which it has reason to believe or suspect may be dumped or subsidized prices." H.R. Conf. Rep. No. 100-576, at 590 (1988), reprinted in 1988 U.S.C.C.A.N. 1547, 1623 ("House Report"). The House Report further states that, "the conferees do not intend for Commerce to conduct a formal investigation to ensure that such prices are not dumped or subsidized, but rather intend that Commerce base its decision on information generally available to it at that time." H.R. Conf. Rep. No. 100-576, at 590-91, reprinted in 1988 U.S.C.C.A.N. at 1623-24.

In the case at bar, Plaintiff/Defendant-Intervenors take issue with Commerce's reasoning for rejecting certain record evidence concerning price data from Spain and Mexico. Commerce responds that it has discretion to determine the "best available information," and that it reasonably concluded that Australian yabby prices for the valuation of Chinese crawfish was such information. Section 1677b(c)(1) of Title 19 of the United States Code directs Commerce to use "the best available information"

concerning the values for FOP from a market economy when calculating the NV for a product exported from an NME country, such as the PRC. See China Nat'l, 27 CIT at ___, 264 F. Supp. 2d at 1234. The Court of Appeals for the Federal Circuit ("CAFC") has reasoned that "there is much in the statute [19 U.S.C. § 1677b(c)(1) and (4)] that supports the notion that it is Commerce's duty to determine margins as accurately as possible, and to use the best information available to it in doing so." Lasko, 43 F.3d at 1443; see also Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States, 268 F.3d 1376, 1382 (Fed. Cir. 2001).

In previous reviews, Commerce used data on imports into Spain from Portugal to value live crawfish input for tail meat. See Commerce's Mem. at 5. For the third administrative review, however, Commerce determined that Spanish imports from Portugal had significantly decreased and the diminished volume was no longer sufficient to constitute a basis for the calculation of surrogate value. See id. Commerce undertook a search for other market economy country data that would reflect a more substantial volume of trade. See id. Commerce subsequently selected Australia as the surrogate country to value freshwater crawfish input. See id. In doing so, Commerce compared Australian price data to Spanish and Mexican price data on the record and determined that only the Australian data was appropriate. Commerce stated that "the Spanish Study does not consist of a discrete set of data on live crawfish

prices, regularly maintained and published by government authorities." See Issues & Decision Mem.[4] at 23.

Qingdao, Yancheng and Hontex contend that Commerce's reasoning for finding the Spanish Study unreliable is flawed because it is "an official government report" and Commerce has "traditionally accepted this same type of broad-based, industry-wide source of surrogate value information." Qingdao & Yancheng Mem. at 16-17; see Hontex's Mem. at 6-8. Commerce's conclusion regarding the unreliability of the Spanish Study, however, does not rest solely on wether it was published by government authorities or if it contains broad-based, industry-wide data. Rather, Commerce noted that "the price data in the Spanish Study were averages calculated . . . upon numerous assumptions and possibly incomplete and/or inaccurate and/or roughly estimated data." Issues & Decision Mem. at 25. Commerce reasonably concluded that the Spanish Study does not indicate how many companies provided information for the allocations it contained and whether the responses to questions

---

[4] The full title of this document is Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review and Final Partial Recission of Antidumping Duty Administrative Review of Freshwater Crawfish Tail Meat from the People's Republic of China: September 1, 1999 through August 31, 2000, compiled as an appendix to the Final Results, 65 Fed. Reg. at 19,546 (generally accessible on the internet at http://ia.ita.doc.gov/frn/summary/prc/02-9802-1.txt). The Court, in the interest of clarity, will refer to this document as Issues & Decision Mem. and match pagination to the printed documents provided by defendant. See e.g., Def.'s Pub. Ex. at Tab 25.

regarding seasonal averages of purchase prices or volumes were complete.  See id.

Commerce notes that the consultant who compiled the Spanish Study explained to Commerce "that some of the [crawfish] companies to which he sent the questionnaire provided full responses, and some provided only partial responses—varying in degree of completeness."[5]  Id. at 24.  Commerce reasonably concluded that it could not determine that there is a "substantial likelihood that the price information contained within [the Spanish Study] is comprised of averages and/or is representative of a wide, or otherwise appropriate, range of prices from within the POR, and not potentially distorted by the influence and/or special interests of any private sector parties."  Issues & Decision Mem. at 25-26.  Commerce reasonably determined that the price information contained in the Spanish Study reflected unchecked, and possibly incomplete, estimates rather than actual prices.[6]  Commerce is charged with

_____

[5]     The questionnaire sent by the consultant who compiled the Spanish Study "contained [inter alia] requests for a variety of general information, including the range of products produced by each [crawfish] company, the percentage of total sales attributable to crawfish, employment numbers for crawfish production, [and,] the percentage of production sold to domestic and/or export markets." See Issues & Decision Mem. at 23-24.

[6]     Qingdao and Yancheng contend that Commerce's rejection of the data in the Spanish Study is inconsistent with Commerce's "established preference to base surrogate values on industry-wide averages rather than on data on individual transactions from individual producers." See Qingdao & Yancheng's Mem. at 18.  In

determining antidumping duty margins as accurately as possible.
See Lasko, 43 F.3d at 1443; see also Shakeproof, 268 F.3d at 1382.
If Commerce had used the data contained within the Spanish Study,
Commerce would have contravened its duty to determine the
antidumping duty as accurately as possible.[7]

Commerce also reasonably determined that record evidence did
not establish the existence of a commercial crawfish industry in
Mexico.  See Issues & Decision Mem. at 36-39.  The record
indicates, and Bo Asia et al. concede, that complete official
statistics regarding the existence of a crawfish industry in Mexico
are unavailable.[8]  See Bo Asia's Br. at 11.  The record contains

the case at bar, however, Commerce principally took issue with the
completeness and accuracy of the data and not with whether the data
was compiled by a private individual or by a governmental entity.
See Issues & Decision Mem. at 25-26.

[7]    Plaintiffs/Defendant-Intervenors point out that Spain and
not Australia's economic development based on GNI per capita is
more comparable to China's economic development.  Nonetheless, for
surrogate value purposes, Commerce is charged with more than simply
choosing a country with comparable economic development to the NME
country involved in the review.  Commerce's ultimate goal is to
choose surrogate values that will allow a valuation that reflects
the products normal value as if the PRC were a market economy
country.  See China Nat'l, 27 CIT at ____, 264 F. Supp. 2d at 1236.
The Court notes that while Australian yabbies are not identical to
Chinese crawfish used to produce crawfish tail meat, Commerce
reasonably determined that the values it chose would aide Commerce
in achieving its ultimate goal.

[8]    Bo Asia et al. also concede that "there clearly is
disagreement among [Mexican government] officials regarding the
existence of freshwater crawfish tail meat in the Mexican State of
Veracruz . . . ."  Bo Asia's Br. at 11.

certain evidence, such as a letter from a local Mexican government official, that indicates the existence of a commercial crawfish industry in Veracruz. See Issues & Decision Mem. at 36. In June of 2001, Commerce sent a team of analysts to Mexico to research freshwater crawfish and determine whether Mexico has a crawfish industry. See id. at 32. Information gathered from interviews with government and industry officials directly contradicted record evidence regarding the existence of a crawfish industry in Mexico. See id. at 38. Furthermore, Commerce determined that even if the record evidence "provided dispositive evidence that there was a commercial freshwater crawfish tail meat processing industry, this documentation would not validate the use of flawed statistics for whole, live freshwater crawfish prices." Issues & Decision Mem. at 39. The Court finds that Commerce's determination that Mexican price data on the record was inappropriate for use as a surrogate value for whole, live crawfish was reasonable.

## II. Commerce Properly Used Data from an Australian Company to Calculate NV

### A. Contention of the Parties

#### 1. CPA's Contentions

CPA complains that the surrogate value chosen by Commerce for whole live freshwater crawfish violated 19 U.S.C. § 1677b(c) (1994) because it was not "the best available information" on the record.

See Br. CPA Supp. Mot. J. Agency R. ("CPA's Mem.") at 5-15. Specifically, CPA argues that Commerce improperly rejected data published by the Australian Bureau of Agriculture and Resource Economics ("ABARE") concerning the quantity and value of live crawfish produced and sold in Australia during the POR. See id. at 6. Instead of using the ABARE statistics, Commerce relied on the price list for small and aesthetically blemished crawfish of a single Australian company, Mulataga Party Ltd. ("Mulataga"). See id. Commerce concluded that Chinese tail meat was produced from crawfish with live weights of 40 grams or less. See id. CPA contends that this decision was improper because larger crawfish are used in China and Australia to produce tail meat. See id. at 6-7. Additionally, there is no record evidence indicating that Chinese tail meat is exclusively produced from aesthetically blemished crawfish. See id. at 6-7. The record demonstrates, however, that Chinese processors use crawfish with live weights ranging from 40 grams to 70 grams. See id. at 6. Commerce reached its conclusion without addressing specific information on the record, in the Table of Equivalents, indicating that crawfish with live weights more than 40 grams were used to produce Chinese tail meat. Id. at 9. Consequently, CPA complains that "Commerce has failed to provide a reasonable basis for concluding that blemished Australian yabbies of 30-40 grams are the 'best available' surrogate for Chinese crawfish generally, including the crawfish of

41-76 grams known to be used by Chinese processors." Id. at 12.

CPA further contends that Commerce improperly limited the factor value to prices for "seconds," whole crawfish that are aesthetically blemished. See id. CPA asserts that there is no record evidence that indicates that Chinese crawfish processors only use "seconds" to produce tail meat. See id. at 13. Aesthetically unblemished crawfish can command a higher price than "seconds" since "an unblemished crawfish is more attractive to purchasers who would use it whole." Id. Accordingly, CPA contends that "the surrogate value should reflect the fact that, if the Chinese approach of using all sizes of crawfish for tail meat were practiced in a market economy country, the average value of live crawfish inputs would be higher than otherwise." Id. CPA complains that Commerce's reasons for rejecting the ABARE statistics does not support its preference for Mulataga's list prices. See id. at 15. The methodological soundness and reliability of the ABARE's statistics were not challenged during the relevant administrative proceeding. See id. The statistics collected by the ABARE cover 245-306 metric tons of annual production and are collected and published by an agency of the Australian federal government. See id. CPA maintains that "[n]o other source of crawfish pricing data on the administrative record was collected with the same rigor or by a more qualified source."

Id. Commerce failed, CPA argues, to comply with 19 U.S.C. §
1677b(c)(2) because the ABARE statistics are superior to Mulataga's
price list. See id.

### 2. Commerce's Contentions

Commerce responds that it properly exercised its discretion in
deciding to use Mulataga's price list for the surrogate values.
See Commerce's Mem. at 23-27. Commerce has broad discretion in the
valuation of FOP and its methodology should be upheld as long as it
is reasonable. See id. at 23-24. Here, Commerce took into
consideration the smaller size of Chinese crawfish, which are a
different species than the Australian yabby, to determine the
appropriate surrogate values. See id. at 24. Recognizing that
yabbies are a larger species of crawfish than those used in China,
Commerce selected yabby prices that would be comparable to Chinese
crawfish. See id. at 27. Commerce also found that, in Australia,
yabbies weighing 40 grams or less and larger seconds are more
likely processed into tail meat. See id. at 24. Additionally,
Commerce found that seconds, rather than larger unblemished
crawfish, command a lower price, which is more similar to what the
price for crawfish should be in the PRC. See id.

Commerce used Mulataga because its "prices reflected the
prices paid by Australian processors to the farmers and catchers at
the same point of distribution as the whole live freshwater

crawfish in China." Id. at 24.  Commerce chose Mulataga because it is the largest producer of yabbies in Australia, and its "data was verified, reliable, product-specific, average non-export values representative of prices over several years including the POR . . . ." Id.  In contrast, Commerce found that the ABARE prices on the record include the wider range of crawfish produced in Australia and are thus not comparable to the smaller size Chinese crawfish. Commerce was within its discretion to determine that Mulataga's prices were the most comparable to Chinese crawfish and, therefore, the "best available information."

### B.  Analysis

The Court rejects CPA's complaint that Commerce erred in using Mulataga's price list for the valuation of live crawfish.  CPA argues that Commerce's reasons for rejecting the ABARE statistics does not support its preference for using Mulataga's list prices. See CPA's Mem. at 15.  CPA further contends that Commerce erroneously concluded that Chinese processors typically use live crawfish weighing only 30-40 grams even though there is record evidence that Chinese crawfish processors use crawfish weighing 41-76 grams.  CPA's Mem. 8-9.  The Court, however, does not agree because Commerce's determination was reasonable and supported by substantial record evidence.

Agency statements provide guidance to regulated industries.

"'An [agency] announcement stating a change in the method . . . is not a general statement of policy.'" American Trucking Ass'ns, Inc. v. ICC, 659 F.2d 452, 464 n.49 (5th Cir. 1981) (quoting Brown Express, Inc. v. United States, 607 F.2d 695, 701 (5th Cir. 1979) (internal quotations omitted)). While a policy denotes "the general principles by which a government is guided" by laws, BLACK'S LAW DICTIONARY 1178 (7th ed. 1999) (emphasis added), methodology refers only to the "mode of organizing, operating or performing something, especially to achieve [the goal of a statute]." Id. at 1005 (defining mode) (emphasis added). Accord Avoyelles Sportsmen's League, Inc. v. Marsh, 715 F.2d 897 (5th Cir. 1983); Interstate Natural Gas Ass'n of Am. v. Federal Energy Regulatory Comm'n, 716 F.2d 1 (D.C. Cir. 1983); Hooker Chems. & Plastics Corp. v. Train, 537 F.2d 620 (2d Cir. 1976). Consequently, the courts are even less in the position to question an agency action if the action at issue is a choice of methodology, rather than policy. See, e.g., Maier, P.E. v. United States Envtl. Prot. Agency, 114 F.3d 1032, 1043 (10th Cir. 1997) (citing Professional Drivers Council v. Bureau of Motor Carrier Safety, 706 F.2d 1216, 1221 (D.C. Cir. 1983)). Commerce's methodology does not have to be "the only way  or even the best way to calculate surrogate values for factors of production as long as it was reasonable." Shandong Huarong Gen. Corp. v. United States, 25 CIT ___, ___, 159 F. Supp. 2d 714, 721 (2001).

Commerce has broad discretion in deciding what constitutes the best available information.  The Court's role in evaluating CPA's challenge to Commerce's methodology is to determine whether such methodology is supported by substantial evidence and in accordance with law.  See id.  Commerce notes that it would have preferred to use the ABARE prices to value live crawfish.  See Issues & Decision Mem. at 22.  The ABARE price data, however, contained information on prices paid for all sizes of yabby.  The difference in crawfish sizes used by tail meat producers in Australia and China, and "the fact that only the small, seconds or surplus yabbies go into tail meat production in Australia, [led Commerce] to conclude that using the total value and volume inclusive of all sizes, as issued by ABARE, is not appropriate in this case . . . ."  Issues & Decision Mem. at 15.  Commerce reasonably concluded that smaller yabbies, while not identical to Chinese crawfish, were comparable to Chinese crawfish in size, see id. at 14, and that Mulataga's price list was a better source for surrogate values than the ABARE data.

**III. Commerce's Properly Rejected Information Regarding a Possible Affiliation Between Qingdao and a Chinese Crawfish Exporter**

**1.   Contentions of the Parties**

**A.   CPA's Contentions**

CPA complains that Commerce improperly rejected evidence that Qingdao had failed to disclose all relevant corporate affiliations.

See CPA's Mem. at 16-22.  Specifically, CPA contends that the final antidumping duty margin for Qingdao should be based on adverse facts available because the record indicates that Qingdao failed to disclose its affiliation with another producer and exported of the subject merchandise, China I/E Corporation of State Farms, Qingdao Branch ("China I/E").  See id. at 17-18.  On November 1, 2001, CPA submitted publicly available information ("PAI") consisting of six exhibits number 28 through 32 ("November Submission").  See id. at 16.  The November Submission included pages from a website that identified Mrs. Wang Shuzhen as the general manager for China I/E. See id.  It also included pages describing the specific sizes of crawfish tail meat produced and offered for export sale by China I/E.  See id.  The portion of Exhibit 30 that showed that China I/E produced tail meat in the size range of 60-80 tails per pound was "used to support a calculation of a possible surrogate value for live crawfish."  Id. at 17.  In addition, Exhibit 30 included domain name registration data indicating that China I/E owned the website's domain name.  See id. 16-17.  CPA maintains that it included this information in the November Submission to authenticate the information submitted.  See id.  Accordingly, CPA contends that the November Submission did not contain new factual information pursuant to 19 C.F.R. § 351.301(c)(3) (1999) because its purpose was to show that Qingdao produced tail meat in the size range of 60-80 tails per pound.  See id. at 17-21.

While the November Submission's purpose was to aide Commerce in choosing a surrogate value, Exhibit 30 also demonstrates that China I/E and Qingdao were affiliated entities, which indicates that Qingdao had not been forthcoming in disclosing its corporate affiliations. See id. at 20. Although the information regarding Qingdao and China I/E was placed on the record in the November Submission, CPA was precluded from making any legal arguments about the possible affiliation between the two companies. See id. at 19. Commerce did not address any of the information contained in the November Submission until March 21, 2002. See id. at 18. Commerce informed the parties, prior to the public hearing on March 22, 2002, that the pages in the November Submission regarding the domain name registration were to be stricken from the record as untimely new factual information. See id. at 19. Commerce indicated, however, that several pages in the November Submission regarding surrogate values were not untimely and would be retained on the record. See id.

CPA maintains that "there can be no question that PAI Exhibit 30 [of the November Submission] was timely submitted." Id. at 21. Rather, CPA argues that the central issue is whether Exhibit 30 "could legitimately be used for any purpose other than assigning a specific surrogate value to a specific factor of production." Id. There is no statutory provision or regulation that precludes timely

arguments based on timely factual information. CPA states that 19 U.S.C. § 1677m(g) (1994) "requires Commerce to accept comment from all interested parties regarding the factual information on the administrative record." CPA's Mem. at 21. Moreover, CPA maintains that, under 19 U.S.C. § 1516a(b)(2)(A)(i) (1994), the administrative record includes all information presented to Commerce during the administrative proceeding. See id.

Since the deadline for submissions of factual information had already lapsed, Commerce was left with two options. See CPA's Mem. at 22. Commerce could have left the record closed and applied adverse inferences against Qingdao, or requested further information about Qingdao's corporate affiliations and rendered a decision accordingly. See id. Rather, Commerce chose to reject the information as part of the record. See id. Accordingly, CPA requests that the issue be remanded to Commerce to reconsider Qingdao's dumping margin "in light of record evidence of its undisclosed affiliation with China I/E Corp. or such other evidence," which Commerce may discover upon reopening the record and further investigating. Id.

### B. Commerce's Contentions

Commerce responds that it properly rejected parts of CPA's November Submission regarding a possible affiliation between Qingdao and China I/E because the regulatory deadline for

submissions of new factual information had expired.  <u>See</u> Commerce's
Mem. at 27-31.  Commerce's regulations specify deadlines for the
receipt of particular information.  <u>See</u> <u>id.</u> at 28.  In the case at
bar, the deadline for the receipt of new factual information,
pursuant to Commerce's regulations, was February 17, 2001.  <u>See</u> <u>id.</u>
The deadline for the submission of PAI to value FOP was 20 days
after the publication of the <u>Preliminary Results</u>, 66 Fed. Reg.
52,100, which was November 1, 2001.  <u>See</u> Commerce's Mem. at 28.
Commerce contends that the information regarding a possible
affiliation between Qingdao and China I/E was new factual
information unrelated to the valuation of FOP submitted after the
deadline for such information.  <u>See</u> <u>id.</u> at 29.

Contrary to CPA's assertion, Exhibit 30 of the November
Submission did not relate to the valuation of FOP.  <u>See</u> <u>id.</u>  The
first two pages contained information about the different sizes of
crawfish tail meat produced and exported by a Chinese crawfish
company.  <u>See</u> <u>id.</u>  The next two pages, however, contained domain
name registration information.  <u>See</u> <u>id.</u>  Commerce asserts that "the
only argument that CPA advanced was that [Commerce] should use
Australian surrogate values for crawfish in the 40-70g size range
because crawfish in that range are used by the Chinese freshwater
crawfish companies to produce subject merchandise."  <u>Id.</u>  In its
case brief submitted on November 27, 2001, CPA argued for the first

time that the record showed Mrs. Wang Shuzhen was the general manager of Qingdao and that after the POR she became the general manager of China I/E. See id. Commerce's "regulations establish deadlines in order to afford Commerce ample time to investigate the allegations raised by interested parties." Id. at 30. Here, Commerce had already verified Qingdao's questionnaire responses. See id. at 30-31. Consequently, Commerce maintains that it properly rejected the information regarding a possible affiliation contained in the November Submission because this information "could not be subject to verification or meaningfully analyzed by [Commerce] . . . ." Id. at 31.

### 2. Analysis

Commerce's regulations set forth the deadlines for the receipt of particular information from interested parties in an administrative proceeding. See 19 C.F.R. § 351.301 (1999). The deadline for the submission of factual information is 140 days after the anniversary month. See 19 C.F.R. § 351.301(b)(2). Interested parties may submit PAI to value FOP within 20 days after the publication date of Commerce's preliminary results. See 19 C.F.R. 351.301(c)(3)(ii). In the case at bar, CPA argues that Commerce ignored these regulations and improperly rejected information submitted as untimely submitted new factual information. The Court finds, however, that Commerce properly rejected the portions of the November Submission that did not

relate to the valuation of FOP.  The Court agrees with CPA that Exhibit 30 contained PAI to value FOP.  CPA essentially argues, however, that if Commerce accepts portions of the November Submission, then Commerce must accept all of the information contained therein.  The Court does not agree because, pursuant to its regulations, Commerce is not required to accept new factual information after the deadline has expired.  See 19 C.F.R. § 351.301.  Commerce may reject actual information imbedded in PAI to value FOP if such information does not relate to FOP valuation.

The information regarding the possible affiliation between Qingdao and China I/E is not related to the information submitted for the valuation of FOP.  The only information contained in Exhibit 30 relating to FOP concerns the size of tail meat produced in China.  See App. Br. CPA Supp. Mot. J. Agency R. ("CPA's App.") at Tab 5.  The deadline for the submission of PAI to value FOP was November 1, 2001.  See 19 C.F.R. § 351.301(c)(3)(ii).  Accordingly, Commerce correctly included in the record the portions of Exhibit 30 that pertained to the proper choice of surrogate values.  Commerce was not required by its regulations to include factual information submissions after the deadline for such, which was February 17, 2001.  See 19 C.F.R. § 351.301(b)(2); see also Reiner Brach GmbH & Co.KG v. United States, 26 CIT ___, ___, 206 F. Supp. 2d 1323, 1334 (2002) (stating that "[t]his Court has previously

held that Commerce has broad discretion to establish its own rules governing administrative procedures, including the establishment and enforcement of time limits, to be reasonable . . ."). If CPA had submitted information regarding the possible affiliation of the two companies prior to February 17, 2001, however, Commerce would have been required to accept the information as part of the administrative record. See 19 C.F.R. § 351.301(b)(2). CPA failed to submit such information prior to the February deadline. See CPA's App. at Tab 5. Consequently, the Court finds that Commerce properly rejected portions of the November Submission unrelated to the valuation of FOP as untimely new factual information.

## IV. Commerce Properly Adjusted Qingdao and Yancheng's By-Product Offset to NV

### 1. Contentions of the Parties

Qingdao and Yancheng complain that Commerce erred in its calculation of NV and contravened its previous surrogate value methodology. See Qingdao & Yancheng's Mem. at 25-29. Specifically, Qingdao and Yancheng argue that Commerce did not adjust the total cost of production by the full offset value of by-product shell scrap resulting from the production of crawfish tail meat.[9] See id. at 25. Instead, Commerce reduced the offset by

---

[9] "Scrap" is the term used to describe part of the crawfish not used in the production of crawfish tail meat and principally consists of crawfish shell, unused meat and water. See Hontex

applying a "wet-dry conversion factor" of 27.5 percent to the by-product offset. See id. Commerce's established practice is to calculate NV for NME respondents as if the NME producers' FOP were in a market economy country. See id. In the case at bar, Commerce rejected the adjustment of surrogate values according to the particular experiences of the respondents. See id. at 26. In the past, Commerce has "accept[ed] the surrogate values as they are, and not attempted to adjust those values for differences, whether real or perceived, between the production processes used by the surrogate country producer(s) and the NME producers." Id. at 27. Here, Commerce found that Chinese producers dried crawfish shells in the sun and sold them as a by-product. See id. Commerce compared this process to information from a Canadian company that sold industrially dried shell scrap. See id. at 26.

Commerce concluded that an adjustment to the offset was required because the two drying process were not comparable. See id. Qingdao and Yancheng assert that there is no basis for Commerce's comparison of drying methodology of an NME producer to that of a surrogate producer. See id. at 27. Moreover, Commerce's analysis contains factual flaws because it assumed that all of the respondents dried the crawfish shell scraps similarly, without

___

Enter., Inc., d/b/a Louisiana Packing Co. v. United States, 27 CIT ___, ___, 248 F. Supp. 2d 1323, 1348, n.24 (2003).

verifying reports of each individual company. See id. The record does not substantiate Commerce's conclusion that Qingdao's scrap shells were not completely dry when sold. See id. at 27-28. Qingdao and Yancheng challenge the use of a wet-dry conversion factor of 27.5 percent when the term "half-dry" used in the verification report for Qingdao, "suggest[s] that the ratio should be at least 50-50." Id. at 28. Commerce's conclusion that sun dried shells are less dry than those put through an industrial process is not supported by record evidence. See id.

Commerce responds that it was proper to apply a wet-dry conversion factor to the crawfish by-product factor. See Commerce's Mem. at 31-35. Commerce asserts that it reasonably applied a 27.5 percent conversion factor because the scrap value on the record is for shells industrially dried. See id. at 32-33. To determine the value of the by-product, Commerce used a price quotation of a Canadian seller of crustacean scrap, which was industrially dried. See id. at 33. Commerce maintains that no information was placed on the record demonstrating that the Chinese "companies' 'half dry' or 'sun-dried' shells are comparable to industrially dried shells." Id. Qingdao and Yancheng had the burden, and failed, to place contradictory information on the record calling into question the accuracy of the wet-dry conversion factor. See id.

## 2.    Analysis

The Court finds that Commerce reasonably determined that a conversion factor was necessary to better reflect the value of the crawfish by-product.  See Hontex, 27 CIT at ___, 248 F. Supp. 2d at 1348-49.  Qingdao and Yancheng essentially argue that Commerce used unreliable and unsubstantiated information in determining to use a 27.5 percent conversion factor.  None of the interested parties, however, submitted information to contradict or put into question the accuracy of the 27.5 percent conversion factor.  Without any contradictory evidence on the record, Commerce properly concluded that industrially dried shells are different than "sun dried" or half-dried" shells.  In valuing FOP in the NME country context, Commerce enjoys considerable discretion.  See Lasko, 43 F.3d at 1446; see also Hontex, 27 CIT at ___, 248 F. Supp. 2d at 1349 (holding that Commerce's use of a wet-dry conversion factor to calculate a value for crawfish tail meat scrap is supported by substantial evidence and in accordance with law).  Here, Commerce reasonably applied its discretion in applying a wet-dry conversion factor of 27.5 percent to the by-product offset for crawfish.


## V.    Commerce Improperly Rejected Certain Submission's by Hontex as "New Information"

### 1.    Contentions of the Parties

Hontex complains that Commerce erred in rejecting certain

submissions made to rebut reports made after its analysts' trip to Spain.  See Hontex's Mem. at 15-23.  Hontex submitted certain exhibits on March 19, 2002, and March 20, 2002, relating to a crawfish study prepared by a Dr. Martinez, a public notice of a conference where Dr. Martinez reported the results of his study, and three affidavits from individuals interviewed by Commerce during its trip to Spain to gather information about the Spanish crawfish industry (the "Spanish Trip").  See id. at 16.  Commerce, however, rejected certain portions of Hontex's submission that it deemed new factual information.  See id.  Hontex contends that the information is not new factual information because the study and notice of appearance rebut and clarify Commerce's Spanish Trip report.  See Hontex's Mem. at 17-18.  Hontex asserts that there is a "high probability that [Commerce] itself already has knowledge (if not a copy) of Dr. Martinez's study, [and] it would be unfair and unreasonable to penalize Respondents," because Commerce failed to place the study on the record.  Id. at 19.  In addition, Hontex maintains that the three affidavits it submitted were meant to demonstrate that the Spanish Trip report was incomplete and factually incorrect.  See id.  The information submitted casts doubt on the veracity of Dr. Martinez's statements and the accuracy of the Spanish Study.  See id. at 17-18.  Hontex argues that this information "was already incorporated by reference into the record, and was thus not 'new factual information' pursuant to 19 C.F.R. §

351.301." Id. at 17.  By placing the Spanish Trip report on the record, Commerce placed new factual information on the record thereby allowing Hontex to submit clarifying or rebuttal information. See id.  Finally, even if the information Hontex submitted was deemed "new factual information," Commerce has the discretion pursuant to 19 C.F.R. § 351.302 (1999) to accept such information. See id. at 20.

Commerce responds that the information submitted by Hontex did not rebut, clarify or correct factual information provided by another interested party. See Commerce's Mem. at 36.  Commerce maintains that 19 C.F.R. § 351.301(c)(1) "specifically provides that rebuttal or clarification information can be submitted in response to information submitted 'by any other interested party,'" and does not apply to information Commerce places on the record. Id. at 37.  Commerce further argues that Hontex has the burden of creating an adequate record.  See id.  Accordingly, any reference to the study and the conference attended by Dr. Martinez in the Spanish Study "does not provide Hontex with the latitude or authority to submit new information on the record." Id. Commerce maintains that it properly exercised its "expressed grant of authority provided by the regulations and determined not to exercise its discretion in declining to accept the information that Hontex submitted." Id. at 38.

## 2.   Analysis

The deadline for new factual information, pursuant to 19 C.F.R. § 351.301(b)(2) is 140 days after the last day of the anniversary month.  In the case at bar, the deadline for new factual information submissions was February 17, 2001.  Pursuant to 19 C.F.R. § 351.301(c)(1), "[a]ny interested party may submit factual information to rebut, clarify, or correct factual information submitted by any other interested party at any time prior to the deadline provided in this section for submission of such factual information . . . no later than 10 days after the date such information is served on the interested party . . . ."  Hontex argues that its submissions of March 19, 2002, and March 20, 2002, were made to rebut and clarify Commerce's findings contained in its Spanish Trip report, which was placed on the record on March 12, 2002.  See Hontex's Mem. at 15-23.  Commerce responds that it properly exercised its discretion and rejected the information submitted by Hontex as too late in the proceeding.  The Court does not find this argument convincing and finds that Commerce improperly rejected Hontex's submissions.

Commerce's regulations allow for interested parties to submit factual information that rebuts, clarifies or corrects factual submissions made by interested parties.  See 19 C.F.R. § 351.301(c)(1).  Commerce asserts that Hontex's submission does not

clarify or rebut factual information submitted by an interested party since Commerce, placed the Spanish Trip report on the record. This argument is unsustainable because under Commerce's interpretation of its regulations, Commerce could place erroneous factual information on the record and interested parties would not be afforded the opportunity to rebut or clarify such record evidence. While Hontex has the burden of creating an adequate record within the regulatory guidelines, Hontex, in this instance, met its burden. Commerce invited parties to provide comments to the Spanish Trip report after it was placed on the record and gave them a deadline of March 18, 2002, which was then extended to March 19, 2002. See Def.'s Pub. Ex. at Tabs 21-24. Hontex complied with this deadline, yet Commerce rejected Hontex's comments on the Spanish Trip report as untimely new factual information. See id. at Tab 24. Hontex's comments were meant to clarify and rebut Commerce's Spanish Trip report, yet Commerce merely rejected the information as untimely new factual information. See id. Consequently, the Court remands this issue with instructions to Commerce to include the submissions made by Hontex on March 19, 2002, and March 20, 2002, as part of the administrative record and explain what bearing, if any, these submissions have on Commerce's final determination.

## VI. Commerce's Determination to Assign a Joint Rate to Nanlian and Jiangsu

### 1. Contentions of the Parties

#### A. Hontex's Contentions

Hontex complains that Commerce erred in applying a single antidumping duty rate to Nanlian and Jiangsu. See Hontex's Mem. at 23-24. Specifically, Hontex argues that this issue was previously decided by the Court in Jiangsu Hilong Int'l Trading Co., Ltd. v. United States, 26 CIT ___, 240 F. Supp. 2d 1313 (2002). See id. at 23. Plaintiff, in that case, sought and received a temporary restraining order and preliminary injunction dated June 4, 2002. See id. Hontex maintains the "Court affirmed the assignment of a separate deposit rate for Jiangsu Hilong."[10] See id. at 24

#### B. Commerce's Contentions

Commerce contends that it properly determined that Nanlian and Jiangsu should be treated as a single entity and assessed them the same antidumping duty rate. See Commerce's Mem. at 39-46. Beginning with the first administrative review, Commerce found that the "nature of the relationships between these two companies constituted a web of control relationships such that prices and

---

[10]    The Court notes that Hontex does not fully address its complaints in its brief. Rather, in Exhibit 1 to its brief, almost as an afterthought or indeed to avoid page limitations imposed by the Court, Hontex includes additional arguments as to why Commerce's assignment of a joint rate was in error. See Hontex's Mem. at Ex. 1.

exports were subject to significant manipulation." Id. at 39.  In
the review at issue, Commerce continued to treat the two companies
as a single entity because it "found evidence of a 'continuing
commercial relationship' between these companies, and evidence of
a 'continuing business relationship' between Mr. Wei Wei and both
companies." Id. at 39-40.  Commerce made this determination after
considering evidence uncovered at verification.  See id. at 43.
Commerce maintains that "[w]hile Hontex takes issue with the
agency's reliance upon the information on this administrative
record and from prior proceedings, the burden of producing
information in an administrative proceeding lies with the
interested party." Id.  Commerce determined that no new evidence
had been presented during the review.  See id.  Consequently,
Commerce did not reconsider the relationship between Jiangsu and
Nanlian.  See id.

        Commerce also asserts that Hontex's complaint is defective
because it failed to raise its arguments before Commerce; "[The
argument] was raised for the first time before this Court." Id. at
40.  Under the doctrine of exhaustion of administrative remedies,
this Court should not consider Hontex's complaint because it was
not raised at the administrative level.  See id. at 40-41.
Commerce asserts that "[t]his is especially so where Commerce has
not changed its determination between the preliminary and final

results but the complainant failed to avail itself of the opportunity to raise its argument during the administrative proceeding." Id. at 41. Additionally, Commerce points out that, contrary to Hontex's assertion, this Court did not rule on the merits of the issue in Jiangsu, 26 CIT ___, 240 F. Supp. 2d 1313. Rather, the Court ruled on a procedural matter and "only determined that Jiangsu had met the threshold for granting a preliminary injunction . . . ." Id. at 45.

### 2. Analysis

As a preliminary matter, Commerce contends that Hontex is precluded from raising the issue of Commerce's assignment of a single antidumping duty rate to Jiangsu and Nanlian pursuant to the doctrine of exhaustion of administrative remedies. See Commerce's Mem. at 40-41. Commerce argues that Hontex failed to raise its argument regarding the assignment of a single duty rate on the administrative level prior to raising the issue before this Court. See id. The Court rejects Commerce's arguments and finds, for the reasons set forth below, that Hontex is not precluded from raising the issue before this court.

The exhaustion doctrine requires a party to present its claims to the relevant administrative agency for the agency's consideration before raising these claims to the Court. See Unemployment Comp. Comm'n of Alaska v. Aragon, 329 U.S. 143, 155

(1946) ("A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action.")  There is, however, no absolute requirement of exhaustion in the Court of International Trade in non-classification cases.  See Alhambra Foundry Co. v. United States, 12 CIT 343, 346-47, 685 F. Supp. 1252, 1255-56 (1988). Section 2637(d) of Title 28 of the United States Code states that "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies."  By its use of the phrase "where appropriate," Congress vested discretion in the Court to determine the circumstances under which it shall require the exhaustion of administrative remedies.  See Cemex, S.A. v. United States, 133 F.3d 897, 905 (Fed. Cir. 1998).  Therefore, because of "judicial discretion in not requiring litigants to exhaust administrative remedies," the Court is authorized to determine proper exceptions to the doctrine of exhaustion.  Alhambra Foundry, 12 CIT at 347, 685 F. Supp. at 1256 (citing Timken Co. v. United States, 10 CIT 86, 93, 630 F. Supp. 1327, 1334 (1986), rev'd in part on other grounds, Koyo Seiko Co. v. United States, 20 F.3d 1156 (Fed. Cir. 1994)).

The Court exercises its discretion to obviate exhaustion where: (1) requiring it would be futile, see Rhone Poulenc, S.A. v. United States, 7 CIT 133, 135, 583 F. Supp. 607, 610 (1984) (in those cases when "it appears that it would have been futile for plaintiffs to argue that the agency should not apply its own regulation"), or would be "inequitable and an insistence of a useless formality" as in the case where "there is no relief which plaintiff may be granted at the administrative level," United States Cane Sugar Refiners' Ass'n v. Block, 3 CIT 196, 201, 544 F. Supp. 883, 887 (1982); (2) a subsequent court decision has interpreted existing law after the administrative determination at issue was published, and the new decision might have materially affected the agency's actions, see Timken, 10 CIT at 93, 630 F. Supp. at 1334; (3) the question is one of law and does not require further factual development and, therefore, the court does not invade the province of the agency by considering the question, see id.; R.R. Yardmasters of Am. v. Harris, 721 F.2d 1332, 1337-39 (D.C. Cir. 1983); and (4) the plaintiff had no reason to suspect that the agency would refuse to adhere to clearly applicable precedent. See Philipp Bros., Inc. v. United States, 10 CIT 76, 79-80, 630 F. Supp. 1317, 1321 (1986).

While a plaintiff cannot circumvent the requirements of the doctrine of exhaustion by merely mentioning a broad issue without

raising a particular argument, plaintiff's brief statement of the argument is sufficient if it alerts the agency to the argument with reasonable clarity and avails the agency with an opportunity to address it.   See generally, Hormel v. Helvering, 312 U.S. 552 (1941); see also Rhone Poulenc Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990).  The sole fact of an agency's failure to address plaintiff's challenge does not invoke the exhaustion doctrine and shall not result in forfeiture of plaintiff's judicial remedies.  See generally, B-West Imports, Inc. v. United States, 19 CIT 303, 880 F. Supp. 853 (1995).  An administrative decision to ignore the issue cannot be dispositive of the question whether or not the issue was properly brought to the agency's attention.  See, e.g., Allnutt v. United States DOJ, 2000 U.S. Dist. LEXIS 4060 (D. Md. 2000).   In the case at bar, Commerce had a sufficient opportunity to address the propriety of assigning a single rate duty to Jiangsu and Nanlian.  While Nanlian did not raise the issue in its case brief, Commerce was sufficiently alerted of the issue by Jiangsu in its case brief.  See Def.'s Pub. Ex. at Tab 18.  The central issue in Jiangsu's case brief is the assignment of one duty rate to Jiangsu and Nanlian.  See id.  Hontex is not precluded from raising the issue before this Court because Commerce was provided with an opportunity to address the issue.[11]

---

[11]     Hontex contends that the exact issue and set of facts regarding the assignment of a single duty rate was previously

During the review at issue, Commerce found evidence of a continuing commercial relationship between Jiangsu and Nanlian and applied a single duty rate to the two companies as it had done in its previous administrative reviews.[12]  Commerce's NME exporter collapsing methodology—applied in the first administrative review for the subject merchandise—is permissible to the extent that Commerce follows market economy collapsing regulations.  See Hontex, 27 CIT at ___, 248 F. Supp. 2d at 1342.  Where Commerce's NME collapsing methodology has departed from the regulations concerning market economy collapsing, however, the Court must determine "whether Commerce has sufficiently articulated a permissible interpretation of the antidumping statute with its

_____

decided by the Court in Jiangsu, 26 CIT ___, 240 F. Supp. 2d 1313. According to Hontex, the Court determined that Jiangsu and Nanlian are separate entities.  See Hontex's Mem. at 23-24.  The issue in the case, however, was not whether the two companies are separate entities.  The Court ruled on a procedural matter, whether Jiangsu had met the threshold for granting a preliminary injunction, and not on the merits of the case.  See Jiangsu, 26 CIT ___, 240 F. Supp. 2d 1313.

[12]    Commerce's assignment of a single duty rate to two or more entities is also referred to as "collapsing" the entities into a single entity.  See Hontex, 27 CIT at ___, 248 F. Supp. 2d at 1337-1342.  While the antidumping duty statute does not expressly provide for the collapsing of entities, this Court has upheld the practice, in the market economy context, as a reasonable interpretation of the statute.  See id. (discussing the steps Commerce follows in determining whether a market economy producer should be collapsed).

stated NME collapsing methodology."[13] Id. at 1341.

In the case at bar, Commerce found that the nature of the connections between the two companies constituted a web of control relationship. Commerce asserts that it re-examined the relationship between the two companies and conducted a verification of the information presented during this review. See id. Commerce argues that Hontex had the burden of creating an administrative record, but failed to produce any evidence indicating a change in circumstances. See Commerce's Mem. at 43-44. Commerce concluded that "the relationships existing in 1997, which formed the basis for the finding that these two entities were so intertwined that they should be assigned a single rate, remain essentially unchanged." Id. at 44. Based on the reasoning found in Hontex, 27 CIT ___, 248 F. Supp. 2d 1323, it is not " clear . . . which set of factors formed the basis of Commerce's collapsing determination." Queen's Flowers De Colom. v. United States, 21 CIT 968, 979, 981 F. Supp. 617, 628 (1997). Accordingly, the Court remands this issue for further proceedings with instructions to Commerce to sufficiently articulate: (a) why its collapsing methodology for NME exporters is a permissible interpretation of the antidumping duty statute; and (b) why its findings warranted the collapsing of

---

[13] The Court thoroughly discusses, in turn, each of the factors considered by Commerce in its collapsing methodology for NME country exporters. See Hontex, 27 CIT at ___, 248 F. Supp. 2d at 1342-1347.

Jiangsu and Nanlian.


**VII. Commerce's Failure to Issue the Final Results Within the Required Statutory Time Period Does Not Render Them Void Ab Initio**

   **1.    Contentions of the Parties**

Bo Asia et al. and Hontex complain that Commerce's Final Results are void ab initio because Commerce failed to issue them within the time frame required by the antidumping duty statute and its implementing regulations. See Bo Asia's Br. at 13-17; Hontex's Mem. at 24-26. Pursuant to 19 U.S.C. § 1675(a)(3)(A) (1994) and 19 C.F.R. § 351.213(h)(1) (1999), Commerce was required to issue the Final Results on February 8, 2001.[14] See Hontex's Mem. at 24. Rather than extend the deadline for the issuance of the Final Results, pursuant to 19 U.S.C. § 1675(a)(3)(A) and 19 C.F.R. § 351.213(h)(1), Commerce issued the Final Results on April 11, 2001, which was two months after the deadline passed. See Hontex's Mem. at 24. Hontex maintains that its counsel called Commerce to inquire whether an extension for the issuance of the Final Results had been formally issued and did not receive a response. See id.

Bo Asia et al. assert that the Statement of Administrative Action ("SAA") accompanying H.R. 5110, H.R. Doc. No. 316, Vol. 1,

---

[14]    Bo Asia et al. contend that the deadline for the issuance of the Final Results was February 11, 2001. See Bo Asia's Br. at 14.

103d Cong., 2d Sess., at 815 (1994), clearly indicates Congress'
intention "to issue a mandate regarding deadlines to [Commerce] to
prevent the dilatory style that was so problematic in pre-Uruguay
Round administrative review." Bo Asia's Br. at 16. Hontex and Bo
Asia et al. contend that Commerce wilfully violated the statute
and should be held accountable. See id. 16-17; Hontex's Mem. at
25-26. Bo Asia et al. argue that "[u]nless this Court acts now to
enforce the statutory and regulatory timetable, the procedural
gains of the Uruguay Round will be lost, Congress' mandate will be
contravened and parties will find themselves back in pre-Uruguay
Round posture . . . ." Bo Asia's Br. at 16. Accordingly, the
Final Results should be voided in order to "send a clear signal
that deadlines have a meaning, and the willful failure to meet
statutory deadlines has consequences." Hontex's Mem. at 26.

Commerce responds that its failure to meet the statutory
deadline for the issuance of the Final Results does not render the
results void ab initio. See Commerce's Mem. at 46-48. Commerce
points out that no statute "establishes a consequence or penalty
for issuing the final results after 120 days." Id. at 47.
Consequently, the deadline imposed by the statute is directory and
not mandatory. See id. Commerce maintains that the publication of
the Final Results after the deadline's expiration does not render
them void ab initio. See id.

## 2.    Analysis

Section 1675(a)(3)(A) of Title 19 of the United States Code provides that Commerce issue its final results "within 120 days after the date on which the preliminary determination is published." Under the statute, Commerce may extend the 120 day period to 180 days if it is not practicable to complete the review within the 120 day time frame. Hontex and Bo Asia et al. point out that Commerce did not meet the 120 day deadline and failed to extend the deadline to 180 days. The Court finds that the statute is directory and not mandatory. While the statute uses the word "shall," which generally suggests mandatory action, see Escoe v. Zerbst, 295 U.S. 490, 493 (1935), a time period provided for in a statute "is not mandatory unless it both expressly requires an agency or public official to act within a particular time period and specifies a consequence for failure to comply with the provision." Alberta Gas Chemicals, Inc. v. United States, 1 CIT 312, 315-16, 515 F. Supp. 780, 785 (1981) (citations omitted). Commerce should not shirk its duty to meet statutory deadlines and should strive to carry out the mandate codified in 19 U.S.C. § 1675(a)(3)(A). Nonetheless, there is no statutory consequence for Commerce's failure to comply in a timely fashion. Even though Commerce issued the Final Results after the deadline expired, they are not void ab initio.

## VIII.  Commerce Properly Determined that Fujian and Pacific Coast are not Affiliated Parties

### 1.  Contentions of the Parties

Bo Asia et al. complain Commerce improperly determined that Fujian and Pacific Coast are not affiliated parties. See Bo Asia's Br. at 17-22. Bo Asia et al. argue that there was ample evidence on the record indicating that Fujian owned a significant percentage of Pacific Coast. See id. at 17. Fujian submitted to Commerce: (a) a copy of the memorandum of understanding between Fujian and Pacific Coast reflecting an agreement whereby Fujian was to acquire shares of Pacific Coast; (b) the promissory note signed as consideration for the acquisition of shares in Pacific Coast; and, (c) an explanation that its investment was made in the form of merchandise which was sold and the proceeds of which were deposited in Pacific Coast's account as payment upon the promissory note. See id. at 17-18. Nonetheless, Commerce found that there was no record evidence showing that Fujian had acquired any of Pacific Coast's equity. See id. at 18. The promissory note under Washington State law, the venue where the sale took place, can serve as adequate consideration for equity ownership. See id.

Bo Asia et al. maintain that Commerce did not reference the promissory note, which "is the principal instrument evidencing Fujian Pelagic's purchase of corporate shares; [and] any determination without its consideration is by definition

unsupported by substantial evidence on the record and otherwise not in accordance with law." Id. at 18-19. Commerce's focus on whether Fujian actually paid Pacific Coast for the corporate shares is misplaced. See id. at 19. Under Washington law, the transfer of stock ownership would be deemed to occur once the promissory note was executed, and "[t]he fact that Fujian Pelagic did in fact make a payment in the form of the delivery of merchandise only substantiates further the veracity of the acquisition." Id. Bo Asia et al. contend that in Commerce's view all corporate shares must be purchased in cash even though Washington law recognizes that "shares are acquired by many means [] other than cash investment." Id. at 20. Commerce equated Fujian's shares in Pacific Coast with the amount it paid to Pacific Coast during the POR. See id. Instead, Commerce should have based Fujian's ownership interest on the full amount it was obligated to pay under the terms of the promissory note. See id. Commerce chose not to verify Pacific Coast's records and did not request further documentation of the arrangements between Pacific Coast and Fujian. Consequently, Fujian's responses to Commerce's questionnaire stating its acquisition of a percentage of Pacific Coast, "along with submission of the promissory notes and the memorandum of understanding, should be sufficient to establish the acquisition absent contradictory evidence on the record, which in this case, there is not." Id. at 21.

If the Court finds that the two companies are not affiliated by virtue of common ownership, Bo Asia et al. alternatively argue that the companies are affiliated pursuant to 19 U.S.C. § 1677(33)(G) (1994). See Bo Asia's Br. at 21. The statute provides for the finding of an affiliation between persons when one controls another person. See id. Fujian's president and general manager serves as the vice president of Pacific Coast, and each of Fujian's shareholders is a member on Pacific Coast's Board of Directors. See id. at 22. Consequently, Fujian "is involved in all key decision making matters of Pacific Coast," and exercises control over the management of Pacific Coast. Id.

### B.   Commerce's Contentions

Commerce replies that it properly determined that Fugian and Pacific Coast are not affiliated because there was no record evidence indicating potential control or ownership between the two entities. See Commerce's Mem. at 48-53. Commerce argues that it properly treated Fujian's sales to the United States "as export price [] sales because the first sales were made to unaffiliated purchasers prior to importation, and constructed export price [] was not otherwise warranted." Id. at 48. Pursuant to 19 U.S.C. § 1677(33), Commerce considered whether Fujian's investment in Pacific Coast amounted to five percent of the total shares of Pacific Coast. See id. at 50. Commerce argues that there was no record evidence demonstrating a transfer of investment through

money or merchandise between the two companies. See id. at 49-50.
Bo Asia et al.'s statement that the promissory note is ample
consideration for the issuance of corporate shares is misplaced
because Commerce "applies the antidumping duty law, and under 19
U.S.C. § 1677(33), Fujian Pelagic has failed to demonstrate that
there was any investment in Pacific [Coast] or that these two
companies are affiliated in any other way." Id. at 51. Fujian
failed to provide documentation illustrating that it had paid in
capital to Pacific Coast before or during the POR; "[t]he only
documentation submitted by Fujian Pelagic et al. that relates to
Fujian Pelagic's claimed investment in Pacific Coast is the sale
from Pacific Coast to a seafood broker in the United States." Id.
(quoting Issues & Decision Mem. at 51). Commerce asserts that Bo
Asia et al. has the burden of creating a complete and accurate
record and failed to do so in this review. See id. at 52.

Commerce also contends that Bo Asia et al. failed to
adequately establish that Fujian controls Pacific Coast. Commerce
could not "determine that one person was legally or operationally
in control of Fujian Pelagic and Pacific Coast because Bo Asia, et
al. failed to provide any evidence concerning the role and
responsibilities that the one individual had as both the president
of Fujian Pelagic and the vice president of Pacific Coast." Id. at
50-51. Commerce points out that the record indicates that a person

unaffiliated with Pacific Coast served as treasurer.  See id. at
52.  Finally, the evidence does not support a determination that
Fujian and Pacific Coast are affiliated.

### 2.   Analysis

The Court finds that Commerce properly determined that Fujian
and Pacific Coast are not affiliated parties under the relevant
statutes.  Section 1677(33) of Title 19 of the United States Code
defines "affiliated persons" as:

> (B) Any officer or director of an organization and
> such organization.
>
> . . .
>
> (E) Any person directly or indirectly owning,
> controlling, or holding with power to vote, 5 percent or
> more of the outstanding voting stock or shares of any
> organization and such organization.
>
> (F) Two or more persons directly or indirectly
> controlling, controlled by, or under common control with,
> any person.
>
> . . .
>
> a person shall be considered to control another person if
> the person is legally or operationally in a position to
> exercise restraint or direction over the other person.

Bo Asia et al. argue that Fujian owns more than five percent of
Pacific Coast, rendering the two companies affiliated pursuant to
19 U.S.C. § 1677(33)(E).  In its review, Commerce requested Fujian
"provide any documentation to demonstrate that it had actually paid
in capital to Pacific Coast prior to or during the POR."  See
Issues & Decision Mem. at 51.  Fujian subsequently submitted

documents demonstrating a sale from Pacific Coast to a United States seafood broker. See id. Fujian's submission included (a) the invoice/packing list from Pacific Coast; (b) a purchase order from the seafood broker to Pacific Coast; and (c) proof of payment from the seafood broker to Pacific Coast. See id.

Fujian has the burden of producing a complete and accurate record. See Zenith Elecs. Corp. v. United States, 988 F.2d 1573, 1583 (Fed. Cir. 1993). Fujian's submissions, however, do not sufficiently demonstrate that the merchandise sold by Pacific Coast originated from Fujian. Commerce reasonably determined that "there is no documented connection which ties [the sale from Pacific Coast to the seafood broker] to the shipment from Fujian Pelagic that purportedly represents Fujian Pelagic's investment in Pacific Coast." Issues & Decision Mem. at 52. Bo Asia et al. alternatively argue that Fujian and Pacific Coast are affiliated because of their common control. While the record indicates that Fujian's president and general manager is also vice-president of Pacific Coast, there is no evidence depicting the duties of Pacific Coasts vice-president. Without such evidence, Commerce reasonably determined that it could not evaluate how much, if any, control Fujian exerted over Pacific Coast. The Court finds that Commerce reasonably determined that Fujian had not made an investment, whether in cash or in the form of a promissory note, in Pacific

Coast and that Fujian did not exercise control over Pacific Coast.


## IX.  Commerce Properly Applied Facts Available to Qingdao Zhengri and Yaou

### 1.    Contentions of the Parties

Bo Asia et al. complain that Commerce erred in applying adverse facts available to Qingdao Zhengri and Yaou.  See Bo Asia et al.'s  Mem. at 22-27.  Qingdao Zhengri and Yaou submitted a consolidated response to sections C and D of Commerce's questionnaire.  See id. at 22.  While Qingdao Zhengri informed Commerce that it would not participate in a verification of its questionnaire responses, Yaou indicated that it would participate in such verification.  See id. at 23.  Commerce subsequently determined that the consolidated questionnaire responses could not be verified because Qingdao Zhengri would not permit verification of its responses.  See id. Consequently, Commerce applied adverse facts available to Qingdao Zhengri and Yaou which resulted in a PRC-wide rate for all of Yaou's subject sales.  See id. Bo Asia et al. assert that adverse facts available should not be applied to Yaou because it acted to the best of its ability to cooperate with Commerce.  See id. Yaou did not wilfully withhold information from Commerce and responded to all the questionnaires and requests made by Commerce.  See id. Yaou offered Commerce all of its company books and records at verification and provided Commerce all of its

sales and FOP information.  See id.

Bo Asia et al. assert that under the relevant statute Commerce must meet a high standard before it can take an adverse inference.  See id. at 23-24.  Commerce may take such an inference "only where if can determine that an interested part[y] has 'failed to cooperate by not acting to the best of its ability to comply with a request for information by [Commerce]."  Id. at 24 (quoting 19 U.S.C. § 1677e(b) (1994).  In addition, Commerce must first find willful misconduct before applying an adverse inference.  See id.  Commerce's determination must be made through a reasoned inquiry and supported by substantial evidence.  See id.  Bo Asia et al. maintain Commerce should have applied neutral facts available to approximate Yaou's dumping rate because Commerce did not provide a reasoned analysis and its determination that Yaou did not act to the best of its ability was not based on substantial evidence.  See id. at 25.

Commerce responds that it was proper to apply a PRC-wide rate to Qingdao and Yaou.  See Commerce's Mem. at 53-56.  Commerce argues that its inability to verify the questionnaire responses submitted by Qingdao Zhengri and Yaou justified the application of adverse facts available to Yaou.  See id. at 53.  Commerce found that the two companies constituted a single entity, and that since one refused to submit to verification Commerce could not verify

only part of the consolidated response.  <u>See</u> <u>id.</u> at 53-54.
Commerce could not determine the veracity of the information
submitted by Qingdao Zhengri and Yaou because it could not verify
such information.  <u>See</u> <u>id.</u> at 54.  Under the relevant statute, the
application of adverse facts available is warranted when Commerce
cannot verify the information provided.  <u>See</u> <u>id.</u>  Commerce also
asserts that it reasonably determined that Yaou failed to cooperate
on account of Qingdao Zhengri's refusal to participate in
verification.  Since Commerce considered Qingdao Zhengri and Yaou
to be a single entity, it "could not verify part of the entity and
assign a separate antidumping margin for Yaou."  <u>Id.</u>  Commerce
maintains that Yaou did not challenge the collapsing of the two
entities and that it properly applied adverse facts available to
Qingdao Zhengri and Yaou.  <u>See</u> <u>id.</u>

### 2.  Analysis

The Court finds Bo Asia et al.'s argument, that Commerce
unjustifiably applied adverse facts available to Qingdao Zhengri
and Yaou, has no merit.  Under section 1677e(a)(2) of Title 19 of
the United States Code, Commerce shall use "facts otherwise
available" when "(1) necessary information is not available on the
record, or (2) an interested party or any other person—(A)
withholds information that has been requested . . . or (D) provides
such information but the information cannot be verified . . . in
reaching the applicable determination under this subtitle."  19

U.S.C. § 1677e(a).  The antidumping duty statute mandates that Commerce use "facts otherwise available" (commonly referred to as "facts available") if "necessary information is not available on the record" of an antidumping proceeding.  See 19 U.S.C. § 1677e(a)(1).

Furthermore, if Commerce determines that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information . . . [then Commerce] may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available."  19 U.S.C. § 1677e(b).  Commerce may apply facts available when it determines that an interested party withholds requested information or fails to cooperate with a request for information.  See 19 U.S.C. § 1677e(a) & (b).  The legislative goal behind Commerce's right to use facts available is to "induce respondents to provide Commerce with requested information in a timely, complete, and accurate manner . . . ."  National Steel Corp. v. United States, 18 CIT 1126, 1129, 870 F. Supp. 1130, 1134 (1994).  Consequently, Commerce enjoys broad, although not unlimited, discretion with regard to the propriety of its use of facts available.  See generally, Olympic Adhesives Inc. v. United States, 899 F.2d 1565 (Fed. Cir. 1990) (acknowledging Commerce's broad discretion to use facts available, but pointing out that Commerce's resort to facts available is an

abuse of discretion where the information Commerce requests does not and could not exist).

The Court finds Commerce's rationale for resorting to adverse facts available convincing and reasonable. During the subject review, Qingdao Zhengri and Yaou reported to Commerce that their responses to Commerce's questionnaire regarding volume and value information would be consolidated because the two companies shared a common owner. See Issues & Decision Mem. at 52. Qingdao Zhengri informed Commerce that it would not participate in verification. See id. Commerce informed both companies that, based on Qingdao's refusal to submit to verification, Commerce could not verify only part of the consolidated responses. See id. at 55. Commerce indicated to the companies that "if a company objects to verification, [Commerce] will not conduct verification and may disregard any or all information submitted by the company in favor of the use of facts available . . . ." Id. Yaou was provided with notice that adverse facts available would be used by Commerce, yet Yaou failed to contact or arrange verification with Commerce. Commerce reasonably concluded that its inability to verify the questionnaire responses was a result of Yaou's failure to cooperate with Commerce. See 19 U.S.C. § 1677e(a) & (b). Consequently, Commerce properly applied adverse facts available and a PRC-wide rate to Qingdao Zhengri and Yaou.

## X.    Payment of Dumping Duties to the Domestic Crawfish Industry

### 1.    Contentions of the Parties

Bo Asia et al. contend that the Continued Dumping and Subsidy Offset Act of 2000 (the "Byrd Amendment")[15] transformed the antidumping law into a "penal" statute and conferred upon United States entities, which are importers, full "due process rights." See Bo Asia's Br. at 30-36.  The Byrd Amendment provides that antidumping and countervailing duties collected on or after October 1, 2000, by the United States Customs Service[16] shall be distributed to affected domestic parties on an annual basis.  See id. at 32. Bo Asia et al. assert that under the Byrd Amendment "the amount collected is no longer 'an additional duty,' it is a penalty."  Id. at 32-33.  The Byrd Amendment, rather than equalize competitive conditions in the United States, shifts revenue from importers to the domestic industry and undermines the remedial purpose of the antidumping duty statute.  See id. at 33.  Bo Asia et al. assert that "[d]istributing the collected duties to domestic petitioners is tantamount to penalizing the foreign producers and/or exporters

---

[15]    The Byrd Amendment was enacted after the publication of the Final Results as part of the Agricultural, Rural Development, Food and Drug Administration, and Related Agencies Appropriation Act, 2001.  See Title X of H.R. Bill 4461.

[16]    The United States Customs Service was renamed the Bureau of Customs and Border Protection of the Department of Homeland Security, effective March 1, 2003.  See H.R. Doc. No. 108-32 (2003).

by providing a subsidy to their direct competitors." Id.
Accordingly, Commerce's actions during the review at issue violates
the United States Constitution because the United States
respondents were not afforded their full due process rights,
including a hearing by a neutral judge, before the imposition of
antidumping duties. See id. at 33-35.

Commerce responds that Bo Asia et al.'s argument is without
any merit. See Commerce's Mem. at 55. Commerce points out that
the CAFC held that "the Byrd Amendment in no way alters the
responsibilities of Commerce, the Byrd Amendment did not convert
the antidumping statute into a penal statute . . . ." Id. (citing
Huaiyin Foreign Trade Corp. (30) v. United States, 322 F.3d 1369,
1379-1380 (Fed. Cir. 2003)). Accordingly, Commerce contends that
the Byrd Amendment "did not confer upon Bo Asia et al. the
constitutional protection of the Fifth Amendment or necessitate a
hearing by a neutral judge before dumping duties may be imposed."
Id.

### 2. Analysis

The Court finds that Bo Asia et al.'s argument is without
merit. The CAFC has held that the Byrd Amendment does not change
the nature of the antidumping duty statute because it does not
impose a penalty. See Huaiyin, 322 F.3d at 1379-1380. The duties
imposed "remain proportional to the amount of harm caused by the

anticompetitive conduct." <u>Id.</u> at 1380.  Consequently, the duties assessed pursuant to the Byrd Amendment are identical to those assessed prior to its passage.  <u>See</u> <u>id.</u>  The Byrd Amendment enhances rather than detracts from the remedial nature of the antidumping duty statute because "[t]he duties now bear less resemblance to a fine payable to the government, and look more like compensation to victims of anticompetitive behaviors."  <u>Id.</u> Pursuant to the CAFC's holding, the Court finds that the Byrd Amendment did not confer upon United States importers the constitutional protections of the Fifth Amendment, including a hearing before a neutral judge, before Commerce may impose dumping duties.

The Court has considered all other arguments raised by CPA and Plaintiffs/Defendant-Intervenors and finds them without merit.


**CONCLUSION**

This case is remanded to Commerce with instructions to (1) include the submissions made by Hontex on March 19, 2002, and March 20, 2002, as part of the administrative record and explain what bearing, if any, these submissions have on Commerce's final determination; and (2) sufficiently articulate (a) why its collapsing methodology for NME exporters is a permissible interpretation of the antidumping duty statute; and, (b) why its

findings warranted the collapsing of Jiangsu and Nanlian.  Commerce

is affirmed in all other aspects.

                                        /s/ Nicholas Tsoucalas
                                     **NICHOLAS TSOUCALAS**
                                        **SENIOR JUDGE**

Dated:      May 6, 2004
            New York, New York